# REPUBLIC OF AUSTRIA ET AL. *v.* ALTMANN

No. 03–13.   Argued February 25, 2004—Decided June 7, 2004

678

*Scott P. Cooper* argued the cause for petitioners. With him on the briefs were *Charles S. Sims* and *Jonathan E. Rich.*

*Deputy Solicitor General Hungar* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Olson, Assistant Attorney General Keisler, Deputy Solicitor General Kneedler, Jeffrey P. Minear, Mark B. Stern, Douglas Hallward-Driemeier, William H. Taft IV,* and *Elizabeth M. Teel.*

*E. Randol Schoenberg* argued the cause for respondent. With him on the brief was *Donald S. Burris.**

JUSTICE STEVENS delivered the opinion of the Court.

In 1998 an Austrian journalist, granted access to the Austrian Gallery's archives, discovered evidence that certain valuable works in the Gallery's collection had not been donated by their rightful owners but had been seized by the Nazis or expropriated by the Austrian Republic after World War II. The journalist provided some of that evidence to respondent, who in turn filed this action to recover possession of six Gustav Klimt paintings. Prior to the Nazi invasion of Austria, the paintings had hung in the palatial Vienna home of respondent's uncle, Ferdinand Bloch-Bauer, a Czechoslovakian Jew and patron of the arts. Respondent claims ownership of the paintings under a will executed by her uncle after he fled Austria in 1938. She alleges that the

---

*Briefs of *amici curiae* urging reversal were filed for Japan by *Craig A. Hoover, Jonathan S. Franklin,* and *Lorane F. Hebert;* and for the United Mexican States by *Jonathan I. Blackman.*

Briefs of *amici curiae* urging affirmance were filed for the Austrian Jewish Community et al. by *Charles G. Moerdler, James A. Shifren, Thomas R. Kline,* and *Marc D. Stern;* for Bet Tzedek Legal Services et al. by *Janie F. Schulman, Jeffrey P. Sinensky,* and *David J. Bederman;* and for Michael Berenbaum et al. by *Edward McGlynn Gaffney, Jr., Arthur Miller,* and *Melvyn Weiss.*

*Andreas F. Lowenfeld* filed a brief for the Société Nationale des Chemins de Fer Français as *amicus curiae.*

Gallery obtained possession of the paintings through wrongful conduct in the years during and after World War II.

The defendants (petitioners here)—the Republic of Austria and the Austrian Gallery (Gallery), an instrumentality of the Republic—filed a motion to dismiss the complaint asserting, among other defenses, a claim of sovereign immunity. The District Court denied the motion, 142 F. Supp. 2d 1187 (CD Cal. 2001), and the Court of Appeals affirmed, 317 F. 3d 954 (CA9 2002), as amended, 327 F. 3d 1246 (2003). We granted certiorari limited to the question whether the Foreign Sovereign Immunities Act of 1976 (FSIA or Act), 28 U. S. C. § 1602 *et seq.*, which grants foreign states immunity from the jurisdiction of federal and state courts but expressly exempts certain cases, including "case[s] . . . in which rights in property taken in violation of international law are in issue," § 1605(a)(3), applies to claims that, like respondent's, are based on conduct that occurred before the Act's enactment, and even before the United States adopted the so-called "restrictive theory" of sovereign immunity in 1952. 539 U. S. 987 (2003).

I

Because this case comes to us from the denial of a motion to dismiss on the pleadings, we assume the truth of the following facts alleged in respondent's complaint.

Born in Austria in 1916, respondent Maria V. Altmann escaped the country after it was annexed by Nazi Germany in 1938. She settled in California in 1942 and became an American citizen in 1945. She is a niece, and the sole surviving named heir, of Ferdinand Bloch-Bauer, who died in Zurich, Switzerland, on November 13, 1945.

Prior to 1938 Ferdinand, then a wealthy sugar magnate, maintained his principal residence in Vienna, Austria, where the six Klimt paintings and other valuable works of art were housed. His wife, Adele, was the subject of two of the paintings. She died in 1925, leaving a will in which she "ask[ed]" her husband "after his death" to bequeath the paintings to

the Gallery.[1]   App. 187a, ¶ 81.   The attorney for her estate advised the Gallery that Ferdinand intended to comply with his wife's request, but that he was not legally obligated to do so because he, not Adele, owned the paintings.   Ferdinand never executed any document transferring ownership of any of the paintings at issue to the Gallery.   He remained their sole legitimate owner until his death.   His will bequeathed his entire estate to respondent, another niece, and a nephew.

On March 12, 1938, in what became known as the "Anschluss," the Nazis invaded and claimed to annex Austria.   Ferdinand, who was Jewish and had supported efforts to resist annexation, fled the country ahead of the Nazis, ultimately settling in Zurich.   In his absence, according to the complaint, the Nazis "Aryanized" the sugar company he had directed, took over his Vienna home, and divided up his artworks, which included the Klimts at issue here, many other valuable paintings, and a 400-piece porcelain collection.   A Nazi lawyer, Dr. Erich Führer, took possession of the six Klimts.   He sold two to the Gallery in 1941[2] and a third in 1943, kept one for himself, and sold another to the Museum of the City of Vienna.   The immediate fate of the sixth is not known.   142 F. Supp. 2d, at 1193.

In 1946 Austria enacted a law declaring all transactions motivated by Nazi ideology null and void.   This did not result in the immediate return of looted artwork to exiled Austrians, however, because a different provision of Austrian

---

[1] Adele's will mentions six Klimt paintings, Adele Bloch-Bauer I, Adele Bloch-Bauer II, Apple Tree I, Beechwood, Houses in Unterach am Attersee, and Schloss Kammer am Attersee III.   The last of these, Schloss Kammer am Attersee III, is not at issue in this case because Ferdinand donated it to the Gallery in 1936.   The sixth painting in this case, Amalie Zuckerkandl, is not mentioned in Adele's will.   For further details, see 142 F. Supp. 2d 1187, 1192–1193 (CD Cal. 2001).

[2] More precisely, he traded Adele Bloch-Bauer I and Apple Tree I to the Gallery for Schloss Kammer am Attersee III, which he then sold to a third party.

law proscribed export of "artworks . . . deemed to be important to [the country's] cultural heritage" and required anyone wishing to export art to obtain the permission of the Austrian Federal Monument Agency.  App. 168a, ¶ 32.  Seeking to profit from this requirement, the Gallery and the Federal Monument Agency allegedly adopted a practice of "forc[ing] Jews to donate or trade valuable artworks to the [Gallery] in exchange for export permits for other works." *Id.*, at 168a, ¶ 33.

The next year Robert Bentley, respondent's brother and fellow heir, retained a Viennese lawyer, Dr. Gustav Rinesch, to locate and recover property stolen from Ferdinand during the war.  In January 1948 Dr. Rinesch wrote to the Gallery requesting return of the three Klimts purchased from Dr. Führer.  A Gallery representative responded, asserting—falsely, according to the complaint—that Adele had bequeathed the paintings to the Gallery, and the Gallery had merely permitted Ferdinand to retain them during his lifetime.  *Id.*, at 170a, ¶ 40.

Later the same year Dr. Rinesch enlisted the support of Gallery officials to obtain export permits for many of Ferdinand's remaining works of art.  In exchange, Dr. Rinesch, purporting to represent respondent and her fellow heirs, signed a document "acknowledg[ing] and accept[ing] Ferdinand's declaration that in the event of his death he wished to follow the wishes of his deceased wife to donate" the Klimt paintings to the Gallery.  *Id.*, at 177a, ¶ 56.  In addition, Dr. Rinesch assisted the Gallery in obtaining both the painting Dr. Führer had kept for himself and the one he had sold to the Museum of the City of Vienna.[3]  At no time during these transactions, however, did Dr. Rinesch have respondent's permission either "to negotiate on her behalf or to allow

---

[3] The sixth painting, which disappeared from Ferdinand's collection in 1938, apparently remained in private hands until 1988, when a private art dealer donated it to the Gallery.  *Id.*, at 119β.

the [Gallery] to obtain the Klimt paintings." *Id.*, at 178a, ¶ 61.

In 1998 a journalist examining the Gallery's files discovered documents revealing that at all relevant times Gallery officials knew that neither Adele nor Ferdinand had, in fact, donated the six Klimts to the Gallery. The journalist published a series of articles reporting his findings, and specifically noting that Klimt's first portrait of Adele, "which all the [Gallery] publications represented as having been donated to the museum in 1936," had actually been received in 1941, accompanied by a letter from Dr. Führer signed " 'Heil Hitler.' " *Id.*, at 181a, ¶ 67.

In response to these revelations, Austria enacted a new restitution law under which individuals who had been coerced into donating artworks to state museums in exchange for export permits could reclaim their property. Respondent—who had believed, prior to the journalist's investigation, that Adele and Ferdinand had "freely donated" the Klimt paintings to the Gallery before the war—immediately sought recovery of the paintings and other artworks under the new law. *Id.*, at 178a–179a, ¶ 61, 182a. A committee of Austrian Government officials and art historians agreed to return certain Klimt drawings and porcelain settings that the family had donated in 1948. After what the complaint terms a "sham" proceeding, however, the committee declined to return the six paintings, concluding, based on an allegedly purposeful misreading of Adele's will, that her precatory request had created a binding legal obligation that required her husband to donate the paintings to the Gallery on his death. *Id.*, at 185a.

Respondent then announced that she would file a lawsuit in Austria to recover the paintings. Because Austrian court costs are proportional to the value of the recovery sought (and in this case would total several million dollars, an amount far beyond respondent's means), she requested a

waiver. *Id.*, at 189a. The court granted this request in part but still would have required respondent to pay approximately $350,000 to proceed. *Ibid.* When the Austrian Government appealed even this partial waiver, respondent voluntarily dismissed her suit and filed this action in the United States District Court for the Central District of California.

## II

Respondent's complaint advances eight causes of action and alleges violations of Austrian, international, and California law.[4] It asserts jurisdiction under § 2 of the FSIA, which grants federal district courts jurisdiction over civil actions against foreign states "as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity" under either another provision of the FSIA or "any applicable international agreement." 28 U. S. C. § 1330(a). The complaint further asserts that petitioners are not entitled to immunity under the FSIA because the Act's "expropriation exception," § 1605(a)(3), expressly exempts from immunity all cases involving "rights in property taken in violation of international law," provided the property has a commercial connection to the United States or the agency

---

[4] As the District Court described these claims:

"[Respondent's] first cause of action is for declaratory relief pursuant to 28 U. S. C. § 2201; [she] seeks a declaration that the Klimt paintings should be returned pursuant to the 1998 Austrian law. [Her] second cause of action is for replevin, presumably under California law; [she] seeks return of the paintings. [Her] third cause of action seeks rescission of any agreements by the Austrian lawyer with the Gallery or the Federal Monument Agency due to mistake, duress, and/or lack of authorization. [Her] fourth cause of action seeks damages for expropriation and conversion, and her fifth cause of action seeks damages for violation of international law. [Her] sixth cause of action seeks imposition of a constructive trust, and her seventh cause of action seeks restitution based on unjust enrichment. Finally, [her] eighth cause of action seeks disgorgement of profits under the California Unfair Business Practices law." *Id.*, at 1197.

or instrumentality that owns the property is engaged in commercial activity here.[5]

Petitioners filed a motion to dismiss raising several defenses including a claim of sovereign immunity.[6] Their immunity argument proceeded in two steps. First, they claimed that as of 1948, when much of their alleged wrongdoing took place, they would have enjoyed absolute immunity from suit in United States courts.[7] Proceeding from this premise, petitioners next contended that nothing in the FSIA should be understood to divest them of that immunity retroactively.

The District Court rejected this argument, concluding both that the FSIA applies retroactively to pre-1976 actions and that the Act's expropriation exception extends to re-

---

[5] The provision reads:

"(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—

.          .          .          .          .

"(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States."

[6] Petitioners claimed (1) "they are immune from suit under the doctrine of sovereign immunity," and the FSIA, 28 U. S. C. §§ 1602–1611, "does not strip them of this immunity"; (2) the District Court "should decline to exercise jurisdiction . . . under the doctrine of *forum non conveniens*"; (3) respondent "fail[ed] to join indispensable parties under Fed. R. Civ. P. 19"; and (4) venue in the Central District of California is improper. 142 F. Supp. 2d, at 1197.

[7] As the District Court noted, *id.*, at 1201, n. 16, respondent alleges that petitioners' wrongdoing continued well past 1948 in the form of concealment of the paintings' true provenance and deliberate misinterpretation of Adele's will. Because we conclude that the FSIA may be applied to petitioners' 1948 actions, we need not address the District Court's alternative suggestion that petitioners' subsequent alleged wrongdoing would be sufficient, in and of itself, to establish jurisdiction.

spondent's specific claims. Only the former conclusion concerns us here. Presuming that our decision in *Landgraf* v. *USI Film Products*, 511 U. S. 244 (1994), governed its retroactivity analysis, the court "first consider[ed] whether Congress expressly stated the [FSIA's] reach." 142 F. Supp. 2d, at 1199. Finding no such statement, the court then asked whether application of the Act to petitioners' 1948 actions "would impair rights [petitioners] possessed when [they] acted, impose new duties on [them], or increase [their] liability for past conduct." *Ibid.* Because it deemed the FSIA "a jurisdictional statute that does not alter substantive legal rights," the court answered this second question in the negative and accordingly found the Act controlling. *Id.*, at 1201. As further support for this finding, the court noted that the FSIA itself provides that "'[c]laims of foreign states to immunity should *henceforth be decided* by courts of the United States . . . *in conformity with the principles set forth in this chapter.*'" *Ibid.* (quoting 28 U. S. C. § 1602) (emphasis in District Court opinion). In the court's view, this language suggests the Act "is to be applied to all cases decided after its enactment regardless of when the plaintiff's cause of action may have accrued." 142 F. Supp. 2d, at 1201.

The Court of Appeals agreed that the FSIA applies to this case.[8] Rather than endorsing the District Court's reliance on the Act's jurisdictional nature, however, the panel reasoned that applying the FSIA to Austria's alleged wrongdoing was not impermissibly retroactive because Austria could not legitimately have expected to receive immunity for that wrongdoing even in 1948 when it occurred. The court rested that conclusion on an analysis of American courts' then-prevalent practice of deferring to case-by-case immunity determinations by the State Department, and on that

---

[8] The Court of Appeals also affirmed the District Court's conclusion that 28 U. S. C. § 1605(a)(3) covers respondent's claims. 317 F. 3d 954, 967–969, 974 (CA9 2002). We declined to review that aspect of the panel's ruling. 539 U. S. 987 (2003).

Department's expressed policy, as of 1949, of "'reliev[ing] American courts from any restraint upon the exercise of their jurisdiction to pass upon the validity of the acts of Nazi officials.'" 317 F. 3d, at 965 (quoting Press Release No. 296, Jurisdiction of United States Courts Re Suits for Identifiable Property Involved in Nazi Forced Transfers (emphasis deleted)).

We granted certiorari, 539 U. S. 987 (2003), and now affirm the judgment of the Court of Appeals, though on different reasoning.

## III

Chief Justice Marshall's opinion in *Schooner Exchange* v. *McFaddon*, 7 Cranch 116 (1812), is generally viewed as the source of our foreign sovereign immunity jurisprudence. In that case, the libellants claimed to be the rightful owners of a French ship that had taken refuge in the port of Philadelphia. The Court first emphasized that the jurisdiction of the United States over persons and property within its territory "is susceptible of no limitation not imposed by itself," and thus foreign sovereigns have no right to immunity in our courts. *Id.*, at 136. Chief Justice Marshall went on to explain, however, that as a matter of comity, members of the international community had implicitly agreed to waive the exercise of jurisdiction over other sovereigns in certain classes of cases, such as those involving foreign ministers or the person of the sovereign.[9] Accepting a suggestion advanced by the Executive Branch, see *id.*, at 134, the Chief Justice concluded that the implied waiver theory also served to exempt the *Schooner Exchange*—"a national armed ves-

---

[9] "Th[e] perfect equality and absolute independence of sovereigns, and th[e] common interest impelling them to mutual intercourse, and an interchange of good offices with each other, have given rise to a class of cases in which every sovereign is understood to wave *[sic]* the exercise of a part of that complete exclusive territorial jurisdiction, which has been stated to be the attribute of every nation." *Schooner Exchange*, 7 Cranch, at 137.

sel . . . of the emperor of France"—from United States courts' jurisdiction. *Id.*, at 145–146.[10]

In accordance with Chief Justice Marshall's observation that foreign sovereign immunity is a matter of grace and comity rather than a constitutional requirement, this Court has "consistently . . . deferred to the decisions of the political branches—in particular, those of the Executive Branch—on whether to take jurisdiction" over particular actions against foreign sovereigns and their instrumentalities. *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480, 486 (1983) (citing *Ex parte Peru*, 318 U. S. 578, 586–590 (1943); *Republic of Mexico* v. *Hoffman*, 324 U. S. 30, 33–36 (1945)). Until 1952 the Executive Branch followed a policy of requesting immunity in all actions against friendly sovereigns. 461 U. S., at 486. In that year, however, the State Department concluded that "immunity should no longer be granted in certain types of cases."[11] App. A to Brief for Petitioners 1a. In a letter to the Acting Attorney General, the Acting Legal Adviser for the Secretary of State, Jack B. Tate, explained

---

[10] Chief Justice Marshall noted, however, that the outcome might well be different if the case involved a sovereign's *private* property:

"Without indicating any opinion on this question, it may safely be affirmed, that there is a manifest distinction between the private property of the person who happens to be a prince, and that military force which supports the sovereign power, and maintains the dignity and the independence of a nation. A prince, by acquiring private property in a foreign country, may possibly be considered as subjecting that property to the territorial jurisdiction; he may be considered as so far laying down the prince, and assuming the character of a private individual; but this he cannot be presumed to do with respect to any portion of that armed force, which upholds his crown, and the nation he is entrusted to govern." *Id.*, at 145.

[11] Letter from Jack B. Tate, Acting Legal Adviser, U. S. Dept. of State, to Acting U. S. Attorney General Philip B. Perlman (May 19, 1952), reprinted in 26 Dept. State Bull. 984–985 (1952), and in *Alfred Dunhill of London, Inc.* v. *Republic of Cuba*, 425 U. S. 682, 711–715 (1976) (App. 2 to opinion of the Court).

that the Department would thereafter apply the "restrictive theory" of sovereign immunity:

> "A study of the law of sovereign immunity reveals the existence of two conflicting concepts of sovereign immunity, each widely held and firmly established. According to the classical or absolute theory of sovereign immunity, a sovereign cannot, without his consent, be made a respondent in the courts of another sovereign. According to the newer or restrictive theory of sovereign immunity, the immunity of the sovereign is recognized with regard to sovereign or public acts *(jure imperii)* of a state, but not with respect to private acts *(jure gestionis)*. . . . [I]t will hereafter be the Department's policy to follow the restrictive theory . . . in the consideration of requests of foreign governments for a grant of sovereign immunity." *Id.*, at 1a, 4a–5a.

As we explained in our unanimous opinion in *Verlinden*, the change in State Department policy wrought by the "Tate Letter" had little, if any, impact on federal courts' approach to immunity analyses: "As in the past, initial responsibility for deciding questions of sovereign immunity fell primarily upon the Executive acting through the State Department," and courts continued to "abid[e] by" that Department's "'suggestions of immunity.'" 461 U. S., at 487. The change did, however, throw immunity determinations into some disarray, as "foreign nations often placed diplomatic pressure on the State Department," and political considerations sometimes led the Department to file "suggestions of immunity in cases where immunity would not have been available under the restrictive theory." *Id.*, at 487–488. Complicating matters further, when foreign nations failed to request immunity from the State Department:

> "[T]he responsibility fell to the courts to determine whether sovereign immunity existed, generally by reference to prior State Department decisions. . . . Thus,

sovereign immunity determinations were made in two different branches, subject to a variety of factors, sometimes including diplomatic considerations. Not surprisingly, the governing standards were neither clear nor uniformly applied." *Ibid.*

In 1976 Congress sought to remedy these problems by enacting the FSIA, a comprehensive statute containing a "set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities." *Id.*, at 488. The Act "codifies, as a matter of federal law, the restrictive theory of sovereign immunity," *ibid.*, and transfers primary responsibility for immunity determinations from the Executive to the Judicial Branch. The preamble states that "henceforth" both federal and state courts should decide claims of sovereign immunity in conformity with the Act's principles. 28 U. S. C. § 1602.

The Act itself grants federal courts jurisdiction over civil actions against foreign states, § 1330(a),[12] and over diversity actions in which a foreign state is the plaintiff, § 1332(a)(4); it contains venue and removal provisions, §§ 1391(f), 1441(d); it prescribes the procedures for obtaining personal jurisdiction over a foreign state, § 1330(b); and it governs the extent to which a state's property may be subject to attachment or execution, §§ 1609–1611. Finally, the Act carves out certain exceptions to its general grant of immunity, including the expropriation exception on which respondent's complaint relies. See *supra*, at 685–686, and n. 5. These exceptions are central to the Act's functioning: "At the threshold of every action in a district court against a foreign state, . . . the court must satisfy itself that one of the exceptions applies," as "subject-matter jurisdiction in any such action depends" on that application. *Verlinden*, 461 U. S., at 493–494.

---

[12] The Act defines the term "foreign state" to include a state's political subdivisions, agencies, and instrumentalities. 28 U. S. C. § 1603(a).

## IV

The District Court agreed with respondent that the FSIA's expropriation exception covers petitioners' alleged wrongdoing, 142 F. Supp. 2d, at 1202, and the Court of Appeals affirmed that holding, 317 F. 3d, at 967–969, 974. As noted above, however, we declined to review this aspect of the courts' opinions, confining our grant of certiorari to the issue of the FSIA's general applicability to conduct that occurred prior to the Act's 1976 enactment, and more specifically, prior to the State Department's 1952 adoption of the restrictive theory of sovereign immunity. See *supra*, at 681, 687–688, and n. 8. We begin our analysis of that issue by explaining why, contrary to the assumption of the District Court, 142 F. Supp. 2d, at 1199–1201, and Court of Appeals, 317 F. 3d, at 963–967, the default rule announced in our opinion in *Landgraf* v. *USI Film Products*, 511 U. S. 244 (1994), does not control the outcome in this case.

In *Landgraf* we considered whether § 102 of the Civil Rights Act of 1991, which permits a party to seek compensatory and punitive damages for certain types of intentional employment discrimination, Rev. Stat. § 1977A, as added, 105 Stat. 1072, 42 U. S. C. § 1981a(a), and to demand a jury trial if such damages are sought, § 1981a(c), applied to an employment discrimination case that was pending on appeal when the statute was enacted. The issue forced us to confront the "'apparent tension'" between our rule that "'a court is to apply the law in effect at the time it renders its decision,'" 511 U. S., at 264 (quoting *Bradley* v. *School Bd. of Richmond*, 416 U. S. 696, 711 (1974)), and the seemingly contrary "axiom that '[r]etroactivity is not favored in the law'" and thus that "'congressional enactments . . . will not be construed to have retroactive effect unless their language requires this result,'" 511 U. S., at 264 (quoting *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 208 (1988)).

Acknowledging that, in most cases, the antiretroactivity presumption is just that—a presumption, rather than a con-

stitutional command[13]—we examined the rationales that support it. We noted, for example, that "[t]he Legislature's . . . responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals," *Landgraf*, 511 U. S., at 266, and that retroactive statutes may upset settled expectations by "'tak[ing] away or impair[ing] vested rights acquired under existing laws, or creat[ing] a new obligation, impos[ing] a new duty, or attach[ing] a new disability, in respect to transactions or considerations already past,'" *id.*, at 269 (quoting *Society for Propagation of the Gospel* v. *Wheeler*, 22 F. Cas. 756, 767 (No. 13,156) (CC NH 1814) (Story, J.)). We further observed that these anti-retroactivity concerns are most pressing in cases involving "new provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance." 511 U. S., at 271.

In contrast, we sanctioned the application to all pending and future cases of "intervening" statutes that merely "confe[r] or ous[t] jurisdiction." *Id.*, at 274. Such application, we stated, "usually takes away no substantive right but simply changes the tribunal that is to hear the case." *Ibid.* (internal quotation marks omitted). Similarly, the "diminished reliance interests in matters of procedure" permit courts to apply changes in procedural rules "in suits arising before [the rules'] enactment without raising concerns about retroactivity." *Id.*, at 275.

Balancing these competing concerns, we described the presumption against retroactive application in the following terms:

> "When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine

---

[13] But see *Landgraf*, 511 U. S., at 266–268 (identifying several constitutional provisions that express the antiretroactivity principle, including the *Ex Post Facto* Clause, Art. I, § 10, cl. 1, and the prohibition on "Bills of Attainder," Art. I, §§ 9–10).

whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command the court must determine whether the new statute would have retroactive effect, *i. e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result." *Id.*, at 280.[14]

Though seemingly comprehensive, this inquiry does not provide a clear answer in this case. Although the FSIA's preamble suggests that it applies to preenactment conduct, see *infra*, at 697–698, that statement by itself falls short of an "expres[s] prescri[ption of] the statute's proper reach." Under *Landgraf*, therefore, it is appropriate to ask whether the Act affects substantive rights (and thus would be impermissibly retroactive if applied to preenactment conduct) or addresses only matters of procedure (and thus may be applied to all pending cases regardless of when the underlying conduct occurred). But the FSIA defies such categorization. To begin with, none of the three examples of retroactivity mentioned in the above quotation fits the FSIA's clarification of the law of sovereign immunity. Prior to 1976 foreign states had a justifiable expectation that, as a matter of comity, United States courts would grant them immunity for their public acts (provided the State Department did not recommend otherwise), but they had no "right" to such im-

---

[14] Applying this rule to the question in the case, we concluded that § 102 of the Civil Rights Act of 1991 should not apply to cases arising before its enactment. 511 U. S., at 293.

munity. Moreover, the FSIA merely opens United States courts to plaintiffs with pre-existing claims against foreign states; the Act neither "increase[s those states'] liability for past conduct" nor "impose[s] new duties with respect to transactions already completed." 511 U. S., at 280. Thus, the Act does not at first appear to "operate retroactively" within the meaning of the *Landgraf* default rule.

That preliminary conclusion, however, creates some tension with our observation in *Verlinden* that the FSIA is not simply a jurisdictional statute "concern[ing] access to the federal courts" but a codification of "the standards governing foreign sovereign immunity as an aspect of *substantive* federal law." 461 U. S., at 496–497 (emphasis added). Moreover, we noted in *Verlinden* that in any suit against a foreign sovereign, "the plaintiff will be barred from raising his claim in *any* court in the United States" unless one of the FSIA's exceptions applies, *id.*, at 497 (emphasis added), and we have stated elsewhere that statutes that "*creat[e]* jurisdiction" where none otherwise exists "spea[k] not just to the power of a particular court but to the substantive rights of the parties as well," *Hughes Aircraft Co.* v. *United States ex rel. Schumer*, 520 U. S. 939, 951 (1997) (emphasis in original). Such statutes, we continued, "even though phrased in 'jurisdictional' terms, [are] as much subject to our presumption against retroactivity as any other[s]." *Ibid.*[15]

---

[15] Of course, the FSIA differs from the statutory amendment at issue in *Hughes Aircraft*. That amendment was attached to the statute that created the cause of action, see former 31 U. S. C. § 3730(b)(1) (1982 ed.), 96 Stat. 978; 31 U. S. C. § 3730(b)(1), 100 Stat. 3154, and it prescribed a limitation that any court entertaining the cause of action was bound to apply, see § 3730(e)(4)(A), 100 Stat. 3157. When a "jurisdictional" limitation adheres to the cause of action in this fashion—when it applies by its terms regardless of where the claim is brought—the limitation is essentially substantive. In contrast, the FSIA simply limits the jurisdiction of federal and state courts to entertain claims against foreign sovereigns. The Act does not create or modify any causes of action, nor does it purport to limit

Thus, *Landgraf*'s default rule does not definitively resolve this case. In our view, however, *Landgraf*'s antiretroactivity presumption, while not strictly confined to cases involving private rights, is most helpful in that context. Cf. 511 U. S., at 271, n. 25 ("[T]he great majority of our decisions relying upon the antiretroactivity presumption have involved intervening statutes burdening private parties"). The aim of the presumption is to avoid unnecessary *post hoc* changes to legal rules on which parties relied in shaping their primary conduct. But the principal purpose of foreign sovereign immunity has never been to permit foreign states and their instrumentalities to shape their conduct in reliance on the promise of future immunity from suit in United States courts. Rather, such immunity reflects current political realities and relationships, and aims to give foreign states and their instrumentalities some *present* "protection from the inconvenience of suit as a gesture of comity." *Dole Food Co. v. Patrickson,* 538 U. S. 468, 479 (2003). Throughout history, courts have resolved questions of foreign sovereign immunity by deferring to the "decisions of the political branches . . . on whether to take jurisdiction." *Verlinden,* 461 U. S., at 486. In this *sui generis* context, we think it more appropriate, absent contraindications, to defer to the most recent such decision—namely, the FSIA—than to presume that decision *inapplicable* merely because it postdates the conduct in question.[16]

---

*foreign* countries' decisions about what claims against which defendants their courts will entertain.

Even if the dissent is right that, like the provision at issue in *Hughes Aircraft,* the FSIA "create[s] jurisdiction where there was none before," *post,* at 723 (opinion of KENNEDY, J.), however, that characteristic is in some tension with other, less substantive aspects of the Act. This tension, in turn, renders the *Landgraf* approach inconclusive and requires us to examine the entire statute in light of the underlying principles governing our retroactivity jurisprudence.

[16] Between 1952 and 1976 courts and the State Department similarly presumed that the Tate Letter was applicable even in disputes concerning conduct that predated the letter. See, *e. g., National City Bank of N. Y.*

## V

This leaves only the question whether anything in the FSIA or the circumstances surrounding its enactment suggests that we should not apply it to petitioners' 1948 actions. Not only do we answer this question in the negative, but we find clear evidence that Congress intended the Act to apply to preenactment conduct.

To begin with, the preamble of the FSIA expresses Congress' understanding that the Act would apply to all postenactment claims of sovereign immunity. That section provides:

> "*Claims* of foreign states to immunity should *henceforth* be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter." 28 U. S. C. § 1602 (emphasis added).

Though perhaps not sufficient to satisfy *Landgraf*'s "express command" requirement, 511 U. S., at 280, this language is unambiguous: Immunity "claims"—not actions protected by immunity, but assertions of immunity to suits arising from those actions—are the relevant conduct regulated by the Act;[17] those claims are "henceforth" to be decided by the courts. As the District Court observed, see *supra*, at 687 (citing 142 F. Supp. 2d, at 1201), this language suggests Con-

---

v. *Republic of China,* 348 U. S. 356, 361 (1955) (assuming, in dicta, that the Tate Letter would govern the sovereign immunity analysis in a dispute concerning treasury notes purchased in 1920 and 1947–1948).

[17] Our approach to retroactivity in this case thus parallels that advocated by JUSTICE SCALIA in his concurrence in *Landgraf:*

"The critical issue, I think, is not whether the rule affects 'vested rights,' or governs substance or procedure, but rather what is the relevant activity that the rule regulates. Absent clear statement otherwise, only such relevant activity which occurs *after* the effective date of the statute is covered. Most statutes are meant to regulate primary conduct, and hence will not be applied in trials involving conduct that occurred before their effective date. But other statutes have a different purpose and therefore a different relevant retroactivity event." 511 U. S., at 291 (opinion concurring in judgment).

gress intended courts to resolve *all* such claims "in conformity with the principles set forth" in the Act, regardless of when the underlying conduct occurred.[18]

The FSIA's overall structure strongly supports this conclusion. Many of the Act's provisions unquestionably apply to cases arising out of conduct that occurred before 1976. In *Dole Food Co. v. Patrickson*, 538 U. S. 468 (2003), for example, we held that whether an entity qualifies as an "instrumentality" of a "foreign state" for purposes of the FSIA's grant of immunity depends on the relationship between the entity and the state at the time suit is brought rather than when the conduct occurred. In addition, *Verlinden,* which upheld against constitutional challenge 28 U. S. C. § 1330's grant of subject-matter jurisdiction, involved a dispute over a contract that predated the Act. 461 U. S., at 482–483, 497. And there has never been any doubt that the Act's procedural provisions relating to venue, removal, execution, and attachment apply to all pending cases. Thus, the FSIA's preamble indicates that it applies "henceforth," and its body includes numerous provisions that unquestionably apply to claims based on pre-1976 conduct. In this context, it would be anomalous to presume that an isolated provision (such as the expropriation exception on which respondent relies) is of purely prospective application absent any statutory language to that effect.

---

[18] The dissent is quite right that "'[a] statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date.'" *Post,* at 719. The provision of the FSIA to which this observation applies, however, is not the preamble but § 8, which states that the "Act shall take effect ninety days after the date of its enactment." 90 Stat. 2898, note following 28 U. S. C. § 1602. The office of the word "henceforth" is to make the statute effective with respect to claims to immunity thereafter asserted. Notably, any such claim asserted immediately after the statute became effective would necessarily have related to conduct that took place at an earlier date.

Finally, applying the FSIA to all pending cases regardless of when the underlying conduct occurred is most consistent with two of the Act's principal purposes: clarifying the rules that judges should apply in resolving sovereign immunity claims and eliminating political participation in the resolution of such claims. We have recognized that, to accomplish these purposes, Congress established a comprehensive framework for resolving any claim of sovereign immunity:

> "We think that the text and structure of the FSIA demonstrate Congress' intention that the FSIA be the sole basis for obtaining jurisdiction over a foreign state in our courts. Sections 1604 and 1330(a) work in tandem: § 1604 bars federal and state courts from exercising jurisdiction when a foreign state *is* entitled to immunity, and § 1330(a) confers jurisdiction on district courts to hear suits brought by United States citizens and by aliens when a foreign state is *not* entitled to immunity. As we said in *Verlinden*, the FSIA 'must be applied by the district courts in every action against a foreign sovereign, since subject-matter jurisdiction in any such action depends on the existence of one of the specified exceptions to foreign sovereign immunity.'" *Argentine Republic* v. *Amerada Hess Shipping Corp.*, 488 U. S. 428, 434–435 (1989) (quoting *Verlinden*, 461 U. S., at 493).

The *Amerada Hess* respondents' claims concerned conduct that postdated the FSIA, so we had no occasion to consider the Act's retroactivity. Nevertheless, our observations about the FSIA's inclusiveness are relevant in this case: Quite obviously, Congress' purposes in enacting such a comprehensive jurisdictional scheme would be frustrated if, in postenactment cases concerning preenactment conduct, courts were to continue to follow the same ambiguous and politically charged "'standards'" that the FSIA replaced. See *supra*, at 691 (quoting *Verlinden*, 461 U. S., at 487–488).

We do not endorse the reasoning of the Court of Appeals. Indeed, we think it engaged in precisely the kind of detailed historical inquiry that the FSIA's clear guidelines were intended to obviate. Nevertheless, we affirm the panel's judgment because the Act, freed from *Landgraf*'s antiretroactivity presumption, clearly applies to conduct, like petitioners' alleged wrongdoing, that occurred prior to 1976 and, for that matter, prior to 1952 when the State Department adopted the restrictive theory of sovereign immunity.[19]

## VI

We conclude by emphasizing the narrowness of this holding. To begin with, although the District Court and Court of Appeals determined that § 1605(a)(3) covers this case, we declined to review that determination. See *supra*, at 681, 687–688, and n. 8. Nor do we have occasion to comment on the application of the so-called "act of state" doctrine to petitioners' alleged wrongdoing. Unlike a claim of sovereign immunity, which merely raises a jurisdictional defense, the act of state doctrine provides foreign states with a substantive defense on the merits. Under that doctrine, the courts of one state will not question the validity of public acts (acts *jure imperii*) performed by other sovereigns within their own borders, even when such courts have jurisdiction over a controversy in which one of the litigants has standing to challenge those acts.[20] See *Underhill* v. *Hernandez*, 168 U. S. 250, 252 (1897); *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398, 401 (1964) ("The act of state doctrine in its

---

[19] Petitioners suggest that the latter date is important because it marked the first shift in foreign states' expectations concerning the scope of their immunity. Whether or not the date would be significant to a *Landgraf*-type analysis of foreign states' settled expectations at various times prior to the FSIA's enactment, it is of no relevance in this case given our rationale for finding the Act applicable to preenactment conduct.

[20] Under the doctrine, redress of grievances arising from such acts must be obtained through diplomatic channels.

traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory"). Petitioners principally rely on the act of state doctrine to support their assertion that foreign expropriations are public acts for which, prior to the enactment of the FSIA, sovereigns expected immunity. Brief for Petitioners 18–20. Applying the FSIA in this case would upset that settled expectation, petitioners argue, and thus the Act "would operate retroactively" under *Landgraf.* 511 U. S., at 280. But because the FSIA in no way affects application of the act of state doctrine, our determination that the Act applies in this case in no way affects any argument petitioners may have that the doctrine shields their alleged wrongdoing.

Finally, while we reject the United States' recommendation to bar application of the FSIA to claims based on pre-enactment conduct, Brief for United States as *Amicus Curiae,* nothing in our holding prevents the State Department from filing statements of interest suggesting that courts decline to exercise jurisdiction in particular cases implicating foreign sovereign immunity.[21] The issue now before us, to which the Brief for United States as *Amicus Curiae* is addressed, concerns interpretation of the FSIA's reach—a "pure question of statutory construction . . . well within the province of the Judiciary." *INS* v. *Cardoza-Fonseca,* 480 U. S. 421, 446, 448 (1987). While the United States' views on such an issue are of considerable interest to the Court, they merit no special deference. See, *e. g., ibid.* In con-

---

[21] See, *e. g., Flatow* v. *Islamic Republic of Iran,* 305 F. 3d 1249, 1251–1252, and n. 4 (CADC 2002) (statement of interest concerning attachment of property that is owned by a foreign state but located in the United States); *Sea Hunt, Inc.* v. *Unidentified Shipwrecked Vessel or Vessels,* 221 F. 3d 634, 642 (CA4 2000) (statement of interest concerning sovereign immunity of a foreign state's vessels); *767 Third Ave. Assoc.* v. *Consulate General of Socialist Federal Republic of Yugoslavia,* 218 F. 3d 152, 157 (CA2 2000) (statement of interest concerning successor states to the Socialist Federal Republic of Yugoslavia).

trast, should the State Department choose to express its opinion on the implications of exercising jurisdiction over *particular* petitioners in connection with *their* alleged conduct,[22] that opinion might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy.[23]   See, *e. g., Verlinden,* 461 U. S., at 486; *American Ins. Assn.* v. *Garamendi,* 539 U. S. 396, 414 (2003) (discussing the President's "'vast share of responsibility for the conduct of our foreign relations'").   We express no opinion on the question whether such deference should be granted in cases covered by the FSIA.

The judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE SCALIA, concurring.

I join the Court's opinion, but add a few thoughts of my own.

---

[22] We note that the United States Government has apparently indicated to the Austrian Federal Government that it will not file a statement of interest in this case.   App. 243a (Letter from Hans Winkler, Legal Adviser, Austrian Federal Ministry for Foreign Affairs, to Deputy Secretary of the Treasury Stuart E. Eizenstat (Jan. 17, 2001)).   The enforceability of that indication, of course, is not before us.

[23] Mislabeling this observation a "constitutional conclusion," the dissent suggests that permitting the Executive to comment on a party's assertion of sovereign immunity will result in "[u]ncertain prospective application of our foreign sovereign immunity law."   *Post,* at 734, 737.   We do not hold, however, that executive intervention could or would trump considered application of the FSIA's more neutral principles; we merely note that the Executive's views on questions within its area of expertise merit greater deference than its opinions regarding the scope of a congressional enactment.   Furthermore, we fail to understand how our holding, which requires that courts apply the FSIA's sovereign immunity rules in *all* cases, somehow injects greater uncertainty into sovereign immunity law than the dissent's approach, which would require, for cases concerning pre-1976 conduct, case-by-case analysis of the status of that law at the time of the offending conduct—including analysis of the existence or nonexistence of any State Department statements on the subject.

In *Landgraf* v. *USI Film Products*, 511 U. S. 244, 292 (1994) (opinion concurring in judgments, joined by KENNEDY and THOMAS, JJ.), I noted our "consistent practice of giving immediate effect to statutes that alter a court's jurisdiction." I explained this on the ground that "the purpose of provisions conferring or eliminating jurisdiction is to permit or forbid the exercise of judicial power" rather than to regulate primary conduct, so that the relevant time for purposes of retroactivity analysis is not when the underlying conduct occurred, but when judicial power was invoked. *Id.*, at 293. Thus, application of a new jurisdictional statute to cases filed after its enactment is not "retroactive" even if the conduct sued upon predates the statute. *Ibid.* I noted that this rule applied even when the *effect* of a jurisdiction-restricting statute in a particular case is to "deny a litigant a forum for his claim entirely, or [to] leave him with an alternate forum that will deny relief for some collateral reason." *Id.*, at 292–293 (citations omitted). The logical corollary of this last statement is that a jurisdiction-expanding statute should be applied to subsequent cases even if it sometimes has the effect of *creating* a forum where none existed.

The dissent rejects this approach and instead undertakes a case-specific inquiry into whether United States courts would have asserted jurisdiction at the time of the underlying conduct. *Post*, at 720–728 (opinion of KENNEDY, J.). It justifies this approach on the basis of *Hughes Aircraft Co.* v. *United States ex rel. Schumer*, 520 U. S. 939 (1997). For reasons noted by the Court, see *ante*, at 695–696, n. 15, I think reliance on that case is mistaken. The Foreign Sovereign Immunities Act of 1976 (FSIA), and the regime that it replaced, do not by their own force create or modify substantive rights; respondent's substantive claims are based primarily on California law, see *ante*, at 685, n. 4. Federal sovereign-immunity law limits the jurisdiction of federal and state courts to entertain those claims, see 28 U. S. C. §§ 1604–1605, but not respondent's right to seek redress elsewhere.

It is true enough that, as to a claim that no foreign court would entertain, the FSIA can have the accidental effect of rendering enforceable what was previously unenforceable. But unlike a *Hughes Aircraft*-type statute, which confers or limits "jurisdiction" in every court where the claim might be brought, the FSIA affects substantive rights only accidentally, and not as a necessary and intended consequence of the law. Statutes like the FSIA do not *"spea[k] . . . to* the substantive rights of the parties," *Hughes Aircraft, supra,* at 951 (emphasis added), even if they happen sometimes to affect them.

JUSTICE BREYER, with whom JUSTICE SOUTER joins, concurring.

I join the Court's opinion and judgment, but I would rest that judgment upon several additional considerations.

I

A

For present purposes I assume the following:

1. Adele Bloch-Bauer died in Vienna in 1925. Her will asked her husband Ferdinand " 'kindly' " to donate, "upon his death," six Klimt paintings to the Austrian Gallery (Gallery). A year later, Ferdinand "formally assured the Austrian probate court that he would honor his wife's gift." See *ante,* at 682; 317 F. 3d 954, 959 (CA9 2002); 142 F. Supp. 2d 1187, 1192–1193 (CD Cal. 2001); Brief for Petitioners 6.

2. When the Nazis seized power in Austria in 1938, Ferdinand fled to Switzerland. The Nazis took over Bloch-Bauer assets, and a Nazi lawyer, Dr. Führer, liquidated Ferdinand's estate. Dr. Führer disposed of five of the six Klimt paintings as follows: He sold or gave three to the Gallery; he sold one to the Museum of the City of Vienna; and he kept one. (The sixth somehow ended up in the hands of a private collector who gave it to the Gallery in 1988.) See *ante,* at 682, 683, n. 3; 317 F. 3d, at 959–960.

3. Ferdinand died in Switzerland in 1945. His will did not mention the paintings, but it did name a residuary legatee, namely, Ferdinand's niece, Maria Altmann, by then an American citizen. As a residuary legatee Altmann received Ferdinand's rights to the paintings. See *ante*, at 681; 317 F. 3d, at 960, 968; Brief for Petitioners 6–7.

4. In 1948, Bloch-Bauer family members, including Altmann, asked Austria to return a large number of family artworks. At that time Austrian law prohibited export of "artworks . . . deemed to be important to Austria's cultural heritage." But Austria granted Altmann permission to export some works of art *in return for* Altmann's recognition, in a legal agreement, of Gallery ownership of the five Klimt paintings. (The Gallery already had three, the Museum of the City of Vienna transferred the fourth, and the Bloch-Bauer family, having recovered the fifth, which Dr. Führer had kept, donated it to the Gallery.) See *ante*, at 683; 317 F. 3d, at 960; 142 F. Supp. 2d, at 1193–1195; Brief for Petitioners 6–8; App. 168a.

5. Fifty years later, newspaper stories suggested that in 1948 the Gallery had followed a policy of asserting ownership of Nazi-looted works of art that it did not own. Austria then enacted a restitution statute allowing individuals to reclaim properties that were subject to any such false assertion of ownership or coerced donation in exchange for export permits. The statute also created an advisory board to determine the validity of restitution claims. See *ante*, at 684; 142 F. Supp. 2d, at 1195–1196; Brief for Petitioners 8.

6. In 1999, Altmann brought claims for restitution of several items including the five Klimt paintings. She told the advisory board that, in 1948, her lawyer had wrongly told her that the Gallery owned the five Klimt paintings irrespective of Nazi looting (title flowing from Adele's will or Ferdinand's statement of donative intent to the probate court). In her view, her 1948 agreement amounted to a coerced donation. The advisory board ordered some items returned (16

Klimt drawings and 19 porcelain settings), but found that the 5 Klimt paintings belonged to the Gallery. See 317 F. 3d, at 960–962; 142 F. Supp. 2d, at 1195–1196; Brief for Petitioners 8, and n. 4.

7. Altmann then brought this lawsuit against the Gallery, an agency or instrumentality of the Austrian Government, in federal court in Los Angeles. She seeks return of the five Klimt paintings.

### B

The question before us does not concern the legal validity of title passed through Nazi looting. Austria nowhere condones or bases its claim of ownership upon any such activity. Rather, its legal claim to the paintings rests upon any or all of the following: Adele's 1925 will, Ferdinand's probate-court confirmation, and Altmann's 1948 agreement. Nor does the locus of the lawsuit in Los Angeles reflect any legal determination about the merits of Austrian legal procedures. Cf. *ante,* at 684–685. The Court of Appeals rejected Austria's *forum non conveniens* claim, not because of the Austrian courts' required posting of a $135,000 filing fee that is potentially refundable, App. 229a–231a, but mainly because of Altmann's age, 317 F. 3d, at 973–974.

The sole issue before us is whether the "expropriation exception" of the Foreign Sovereign Immunities Act of 1976 (FSIA or Act), 28 U. S. C. § 1605(a)(3), withdrawing an otherwise applicable sovereign immunity defense, applies to this case. The exception applies to "foreign state[s]" and to any "agency or instrumentality" of a foreign state. §§ 1603, 1605(a)(3). The exception deprives the entity of the sovereign immunity that the law might otherwise entitle it "in any case," § 1605, where that entity "is engaged in a commercial activity in the United States" *and* the case is one "in which rights in property taken in violation of international law are in issue," § 1605(a)(3).

It is conceded that the Gallery is an "agency or instrumentality" of a foreign state, namely, the Republic of Austria.

Nor can Austria now deny that the Gallery is "engaged in a commercial activity in the United States." The lower courts held that the Gallery's publishing and advertising activities satisfy this condition. 317 F. 3d, at 968–969; 142 F. Supp. 2d, at 1204–1205. And our grant of certiorari did not embrace that aspect of the lower courts' decision. 539 U. S. 987 (2003); see *ante*, at 692.

But what about the last element: Is this a "case . . . in which rights in property taken in violation of international law are in issue"? Altmann claims that Austria's 1948 actions (falsely asserting ownership of the paintings and extorting acknowledgment of its ownership in return for export permits) violated either customary international law or a 1907 Hague Convention. App. 203a–204a; Brief for Respondent 4, 35; Hague Convention (IV) on the Laws and Customs of War on Land, 36 Stat. 2277, 2309, Art. 56 (1907) ("All seizure of . . . works of art . . . is forbidden, and should be made the subject of legal proceedings").

Austria replies that, even so, this part of the statute is not "retroactive." Austria means that § 1605(a)(3), the expropriation exception, does not apply to events that occurred in 1948, almost 30 years before the FSIA's enactment. The upshot is that if the FSIA's general rule of immunity, § 1604, applies retroactively to events in 1948 (as is undisputed here), but the expropriation exception, § 1605(a)(3), does not apply retroactively, then the Gallery can successfully assert its sovereign immunity defense, preventing Altmann from pursuing her claim.

## II

The question, then, is whether the Act's expropriation exception applies to takings that took place many years before its enactment. The Court notes that Congress, when enacting the FSIA in 1976, wrote that the Act should "henceforth" apply to any *claim* brought thereafter. § 1602; *ante*, at 697. The dissent believes that there is no logical inconsistency between an Act that applies "henceforth" and a reading of

§ 1605(a)(3) that limits it to "rights in property *taken after this Act came into force.*" See *post*, at 718–720 (opinion of KENNEDY, J.). I agree with the dissent that the word "henceforth" (and similar words) cannot resolve this disagreement by themselves. Nonetheless several additional considerations convince me that the Court is correct. As Altmann argues, Congress intended the expropriation exception to apply retroactively, removing a defense of sovereign immunity where "rights in property" were "taken in violation of international law," irrespective of when that taking occurred.

*First,* the literal language of the statute supports Altmann. Several similar statutes and conventions limit their temporal reach by explicitly stating, for example, that the Act does "not apply to proceedings *in respect of matters that occurred before the date of the coming into force of this Act.*" State Immunity Act 1978, § 23(3), 10 Halsbury's Statutes 829, 845 (4th ed. 2001 reissue) (U. K.) (emphasis added); see also State Immunity Act 1979, § 1(2) (Singapore); Foreign States Immunities Act 1985, § 7(1) (Austl.); European Convention on State Immunity, Art. 35(3). The 1976 Act says nothing explicitly suggesting any such limitation.

*Second,* the legal concept of sovereign immunity, as traditionally applied, is about a defendant's *status* at the time of suit, not about a defendant's *conduct* before the suit. Thus King Farouk's sovereign status permitted him to ignore Christian Dior's payment demand for 11 "frocks and coats" bought (while king) for his wife; but once the king lost his royal status, Christian Dior could sue and collect (for clothes sold *before* the abdication). See *Ex-King Farouk of Egypt* v. *Christian Dior,* 84 Clunet 717, 24 I. L. R. 228, 229 (CA Paris 1957) (Christian Dior "is entitled . . . to bring" the ex-King to court "to answer for debts contracted" before his abdication "when, as from the date of his abdication, he is no longer entitled to claim . . . immunity" as "Hea[d] of State"); see also *Queen* v. *Bow Street Metropolitan Stipendiary Mag-*

istrate *(Ex parte Pinochet Ugarte),* [2000] 1 A. C., 147, 201–202 (1999) (opinion of Lord Browne-Wilkinson) ("[T]he head of state is entitled to the same immunity as the state itself. . . . He too loses immunity ratione personae on ceasing to be head of state"); cf. *Ter K.* v. *The Netherlands, Surinam & Indonesia,* 18 I. L. R. 223 (DC Hague 1951) (affording Indonesia sovereign immunity after it became independent while the suit was pending).

Indeed, just last Term, we unanimously reaffirmed this classic principle when we held that a now-private corporation could not assert sovereign immunity, even though the events in question took place while a foreign government was its owner. *Dole Food Co.* v. *Patrickson,* 538 U. S. 468, 479 (2003). We added that "[f]oreign sovereign immunity" is not about "chilling" or not chilling "foreign states or their instrumentalities in the conduct of their business." *Ibid.* (KENNEDY, J.). Rather, the objective of the "sovereign immunity" doctrine (in contrast to other *conduct*-related immunity doctrines) is simply to give foreign states and instrumentalities "some protection," at the time of suit, "from the inconvenience of suit as a gesture of comity." *Ibid.;* see also *ante,* at 694–695, 696. Compare conduct-related immunity discussed in, *e. g., Nixon* v. *Fitzgerald,* 457 U. S. 731, 749 (1982) (absolute official immunity); *Harlow* v. *Fitzgerald,* 457 U. S. 800, 813 (1982) (qualified official immunity); *Pinochet, supra,* at 202 (conduct-related immunity for "public acts").

*Third,* the State Department's and our courts' own historical practice reflects this classic view. For example, in 1952, the Department issued the Tate Letter adopting a restrictive view of sovereign immunity, essentially holding foreign sovereign immunity inapplicable in respect to a foreign state's *commercial* activity. Letter from Jack B. Tate, Acting Legal Adviser, U. S. Dept. of State, to Acting U. S. Attorney General Philip B. Perlman (May 19, 1952), reprinted in 26 Dept. State Bull. 984–985 (1952), and in *Alfred Dunhill of London, Inc.* v. *Republic of Cuba,* 425 U. S. 682, 711–715

(1976) (App. 2 to opinion of the Court). As the dissent acknowledges:

> "After the Tate Letter's issuance, the Executive evaluated suits involving *pre-Tate Letter conduct under the Letter's new standard* when determining whether to submit suggestions of immunity to the courts. The Court, likewise, seems to have understood the Tate Letter to require this sort of application. In *National City Bank of N. Y.* [v. *Republic of China,* 348 U. S. 356 (1955)], the Court suggested that the Letter governed in a case involving pre-1952 conduct, though careful consideration of the question was unnecessary there. *[Id.],* at 361." *Post,* at 725 (emphasis and alterations added).

Accord, *ante,* at 696–697, n. 16; see also, *e. g., Arias* v. *S. S. Fletero,* Adm. No. 7492 (ED Va. 1952), reprinted in Digest of United States Practice in International Law 1025–1026 (1977) (State Department deferred decision on a request for immunity filed on May 7, 1952, 12 days before the Tate Letter was issued, and then declined to suggest immunity based on the Tate Letter standard); *New York & Cuba Mail Steamship Co.* v. *Republic of Korea,* 132 F. Supp. 684, 685–686 (SDNY 1955) (State Department declined to suggest immunity even though the suit concerned events over a year before the issuance of the Tate Letter); cf. *Verlinden B. V.* v. *Central Bank of Nigeria,* 461 U. S. 480, 482–483, 497 (1983) (applying the FSIA to a contract that predated the Act).

*Fourth,* contrary to the dissent's contention, see *post,* at 724–725, 729–730, neither "reliance" nor "expectation" can justify nonretroactivity here. Does the dissent mean by "reliance" and "expectation" something real, *i. e.,* an expropriating nation's actual reliance at the time of taking that other nations will continue to protect it from future lawsuits by continuing to apply the same sovereign immunity doctrine? Such actual reliance could not possibly exist in fact.

What taking in violation of international norms is likely to have been influenced, not by politics or revolution, but by knowledge of, or speculation about, the likely future shape of America's law of foreign sovereign immunity? To suggest any such possibility, in respect to the expropriations carried out by the Nazi or Communist regimes, or any other such as I am aware, would approach the realm of fantasy. While the matter is less clear in respect to less dramatic, more individualized, takings, I still find any actual reliance difficult to imagine.

More likely, the dissent is thinking in terms of "'reasonable reliance,'" *post,* at 723, a legal construct designed to protect against unfairness. But a sovereign's reliance on future immunity here would have been unreasonable, hence no such protection is warranted. A legally aware King Farouk or any of his counterparts would have or should have known that foreign sovereign immunity respects current status; it does not protect past conduct. And its application is a matter, not of legal right, but of "grace and comity." *Verlinden, supra,* at 486; see also *Dole, supra,* at 479; *supra,* at 708–709.

Indeed, the dissent itself ignores "reliance" or "expectation" insofar as it assumes an expropriating nation's awareness that the Executive Branch could intervene and change the rules, for example, by promulgating the Tate Letter and applying it retroactively to pre-Tate Letter conduct. Compare *post,* at 725–726, with Brief for Petitioners 11 (Austria expected absolute immunity in 1948), and Brief for United States as *Amicus Curiae* 8 (same). Nor does the dissent convincingly explain why, if the Executive Branch can change the scope of foreign sovereign immunity with retroactive effect, Congress (with Executive Branch approval) cannot "codify" Executive Branch efforts. H. R. Rep. No. 94–1487, p. 7 (1976) (hereinafter H. R. Rep.); S. Rep. No. 94–1310, p. 9 (1976) (hereinafter S. Rep.); *Verlinden, supra,* at 488; Digest of United States Practice in International Law 327 (1976).

*Fifth,* an attempt to read into § 1605(a)(3) a temporal qualification related to the time of conduct, based on a theory of "reliance" or "expectation," creates complications and anomalies. The Solicitor General, on behalf of the United States, proposes a solution that may, at first glance, seem simple: Choose the date of the FSIA, roughly 1976, as a cutoff date and apply the § 1605(a)(3) exception only to property "taken" after that time. See Brief for United States as *Amicus Curiae* 11–12. But the Solicitor General himself complicates the proposal by pointing out, correctly, that each of the different activities described in each of the separate paragraphs of § 1605(a) evolved from different common-law origins and consequently might demand a different cutoff date. *Ibid.* ("commercial activity exception" applies to events arising after 1952; "waiver exception" applies to all events). Moreover, the Solicitor General's limitation on the expropriation exception would give immunity to some entities that, before the FSIA, might not have expected immunity at all (say, because they were not then considered "sovereign"). Compare §§ 1603–1604 with Restatement (Second) of Foreign Relations Law of the United States § 66(g), Comment c, and Reporters' Note 2 (1965) (government corporations only entitled to immunity if exercising public functions); Harvard Research in International Law 483 (1932) ("The use of the term 'State' . . . results in excluding political subdivisions . . .").

The dissent's solution is even more complicated. It does not choose a cutoff date at all, but would remand for the lower courts to determine whether Austria's 1948 conduct would have fallen outside the scope of sovereign immunity under the Tate Letter's view of the matter. *Post,* at 727–728. Of course, Austria in 1948 could not possibly have relied on the Tate Letter, issued four years later. But, more importantly, consider the historical inquiry the dissent sets for the courts: Determine in the year 2004 what the State Department in the years 1952–1976 would have thought about the Tate Letter as applied to the actions of an Austrian

museum taken in the year 1948. That inquiry does not only demand rarified historical speculation, it also threatens to create the very kind of legal uncertainty that the FSIA's enactors hoped to put to rest. See *ante*, at 699.

*Sixth*, other legal principles, applicable to *past conduct*, adequately protect any actual past reliance and adequately prevent (in the dissent's words) "open[ing] foreign nations worldwide to vast and potential liability for expropriation claims in regards to conduct that occurred generations ago, including claims that have been the subject of international negotiation and agreement." *Post*, at 730.

For one thing, statutes of limitations, personal jurisdiction and venue requirements, and the doctrine of *forum non conveniens* will limit the number of suits brought in American courts. See, *e. g.*, 317 F. 3d, at 969–974; *Dayton* v. *Czechoslovak Socialist Republic*, 672 F. Supp. 7, 13 (DC 1986) (applying statute of limitations to expropriation claim). The number of lawsuits will be further limited if the lower courts are correct in their consensus view that § 1605(a)(3)'s reference to "violation of international law" does not cover expropriations of property belonging to a country's own nationals. See 317 F. 3d, at 968; Restatement (Third) of Foreign Relations Law of the United States § 712 (1986) (hereinafter Restatement (3d)).

Moreover, the act of state doctrine requires American courts to presume the validity of "an official act of a foreign sovereign performed within its own territory." *W. S. Kirkpatrick & Co.* v. *Environmental Tectonics Corp., Int'l*, 493 U. S. 400, 405 (1990); see also *ante*, at 700–701; *Banco Nacional de Cuba* v. *Sabbatino*, 376 U. S. 398, 423–424 (1964). The FSIA "in no way affects existing law on the extent to which, if at all, the 'act of state' doctrine may be applicable." H. R. Rep., at 20; S. Rep., at 19; see also *ante*, at 701. The Second Hickenlooper Amendment restricts application of that doctrine, but only in respect to "a confiscation or other taking after January 1, 1959." 22 U. S. C. § 2370(e)(2). The

State Department also has restricted the application of this doctrine, freeing courts to "'pass upon the validity of the acts of Nazi officials.'" *Bernstein* v. *N. V. Nederlandsche-Amerikaansche Stoomvaart-Maatschappij,* 210 F. 2d 375, 375–376 (CA2 1954) *(per curiam)* (quoting State Department press release). But that is a policy matter for the State Department to decide.

Further, the United States may enter a statement of interest counseling dismissal. *Ante,* at 701–702; 28 U. S. C. § 517. Such a statement may refer, not only to sovereign immunity, but also to other grounds for dismissal, such as the presence of superior alternative and exclusive remedies, see 22 U. S. C. §§ 1621–1645*o* (Foreign Claims Settlement Commission); *Dames & Moore* v. *Regan,* 453 U. S. 654, 679–683 (1981) (describing Executive settlement of claims), or the nonjusticiable nature (for that or other reasons) of the matters at issue. See, *e. g., ante,* at 701, n. 21 (collecting cases); *Hwang Geum Joo* v. *Japan,* 172 F. Supp. 2d 52, 58, 64–67 (DC 2001) (finding claims to raise political questions that were settled by international agreements).

Finally, a plaintiff may have to show an absence of remedies in the foreign country sufficient to compensate for any taking. Cf. Restatement (3d) § 713, Comment *f* ("Under international law, ordinarily a state is not required to consider a claim by another state for an injury to its national until that person has exhausted domestic remedies, unless such remedies are clearly sham or inadequate, or their application is unreasonably prolonged"); *Monterey* v. *Del Monte Dunes at Monterey, Ltd.,* 526 U. S. 687, 721 (1999) (requirement of exhausting available postdeprivation remedies under United States law); *Kirby Forest Industries, Inc.* v. *United States,* 467 U. S. 1, 10 (1984) (same). A plaintiff who chooses to litigate in this country in disregard of the postdeprivation remedies in the "expropriating" state may have trouble showing a "tak[ing] in violation of international law." 28 U. S. C. § 1605(a)(3).

Because sovereign immunity traditionally concerns status, not conduct, because other legal principles are available to protect a defendant's reasonable reliance on the state of the law at the time the conduct took place, and for other reasons set forth here and in the Court's opinion, I join the Court.

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE and JUSTICE THOMAS join, dissenting.

This is an important decision for interpreting the Foreign Sovereign Immunities Act of 1976 (FSIA or Act), 28 U. S. C. § 1602 et seq. As the Court's careful opinion illustrates, the case is difficult. In my respectful view, however, its decision is incorrect.

At the outset, here is a summary of my primary concerns with the majority opinion: To reach its conclusion the Court must weaken the reasoning and diminish the force of the rule against the retroactivity of statutes, a rule of fairness based on respect for expectations; the Court abruptly tells foreign nations this important principle of American law is unavailable to them in our courts; this is so despite the fact that treaties and agreements on the subject of expropriation have been reached against a background of the immunity principles the Court now rejects; as if to mitigate its harsh result, the Court adds that the Executive Branch has inherent power to intervene in cases like this; this, however, is inconsistent with the congressional purpose and design of the FSIA; the suggestion reintroduces, to an even greater degree than before, the same influences the FSIA sought to eliminate from sovereign immunity determinations; the Court's reasoning also implies a problematic answer to a separation-of-powers question that the case does not present and that should be avoided; the ultimate effect of the Court's inviting foreign nations to pressure the Executive is to risk inconsistent results for private citizens who sue, based on changes and nuances in foreign affairs, and to add prospective instability to the most sensitive area of foreign relations.

The majority's treatment of our retroactivity principles, its rejection of the considered congressional and Executive judgment behind the FSIA, and its questionable constitutional implications require this respectful dissent.

## I

The FSIA's passage followed 10 years of academic and legislative effort to establish a consistent framework for the determination of sovereign immunity when foreign nations are haled into our courts. See H. R. Rep. No. 94–1487, p. 9 (1976) (hereinafter H. R. Rep.). As we explained in *Verlinden B. V. v. Central Bank of Nigeria,* 461 U. S. 480 (1983), the preceding 30 years had been marked by an emerging or common-law regime in which courts followed the principles set out in the letter from Jack B. Tate, Acting Legal Adviser, U. S. Dept. of State, to Acting U. S. Attorney General Philip B. Perlman (May 19, 1952), reprinted in 26 Dept. State Bull. 984–985 (1952) (hereinafter Tate Letter or Letter). See *ante,* at 689–690. Even after the Tate Letter, however, courts continued to defer to the Executive's case-specific views on whether immunity was due. See *Verlinden, supra,* at 487–488. This regime created "considerable uncertainty," H. R. Rep., at 9, and a "troublesome" inconsistency in immunity determinations, 461 U. S., at 487. The inconsistency was the predictable result of changes in administrations and shifting political pressures. Congress acted to bring order to this legal uncertainty: "[U]niformity in decision . . . is desirable since a disparate treatment of cases involving foreign governments may have adverse foreign relations consequences." H. R. Rep., at 13. See also *id.,* at 7 (The "[FSIA] is urgently needed legislation"). Congress placed even greater emphasis on the implications that inconsistency had for our citizens, concluding that the Act was needed to "reduc[e] the foreign policy implications of immunity determinations and assur[e] litigants that these often crucial decisions are made on purely legal grounds and under procedures that insure due process." *Ibid.*

There is no dispute that Congress enacted the FSIA to answer these problems, for the Act's purpose is codified along with its governing provisions. See 28 U. S. C. § 1602. To this end, the Act provides specific principles by which courts are to decide claims for foreign sovereign immunity. See *ibid.* So structured, the Act sought to implement its objectives by removing the Executive influence from the standard determination of sovereign immunity questions. See H. R. Rep., at 7 (under the FSIA "U. S. immunity practice would conform to the practice in virtually every other country—where sovereign immunity decisions are made exclusively by the courts and not by a foreign affairs agency").

## II

### A

The question is whether the courts, by applying the statutory principles the FSIA announced, will impose a retroactive effect in a case involving conduct that occurred over 50 years ago, and nearly 30 years before the FSIA's enactment. It is our general rule not to apply a statute if its application will impose a retroactive effect on the litigants. See *Landgraf* v. *USI Film Products*, 511 U. S. 244 (1994). This is not a rule announced for the first time in *Landgraf;* it is an old and well-established principle. "It is a principle in the *English* common law, as ancient as the law itself, that a statute, even of its omnipotent parliament, is not to have a retrospective effect." *Dash* v. *Van Kleeck,* 7 Johns. 477, 503 (N. Y. 1811) (Kent, C. J.); see also *Landgraf,* 511 U. S., at 265 ("[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic"). The principle stems from fundamental fairness concerns. See *ibid.* ("Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted").

The single acknowledged exception to the rule against retroactivity is when the statute itself, by a clear statement, requires it. See *id.*, at 264 ("'[C]ongressional enactments . . . will not be construed to have retroactive effect unless their language requires this result'" (quoting *Bowen* v. *Georgetown Univ. Hospital*, 488 U. S. 204, 208 (1988))).

The FSIA does not meet this exception because it contains no clear statement requiring retroactive effect. The majority concedes this at the outset of its analysis, saying the text of the FSIA "falls short of an 'expres[s] prescri[ption of] the statute's proper reach.'" *Ante*, at 694 (alterations in original) (quoting *Landgraf, supra,* at 280).

In an awkward twist, however, the Court also maintains that the "[Act's] language is unambiguous," *ante*, at 697, and that it "suggests Congress intended courts to resolve *all* [foreign sovereign immunity] claims 'in conformity with the principles set forth' in the Act, regardless of when the underlying conduct occurred," *ante*, at 697–698. If the statute were in fact this clear, the exception would apply. Nothing in our cases suggests that statutory language might be "unambiguous," yet still "not sufficient to satisfy *Landgraf*'s 'express command.'" *Ante,* at 697. If the Court really thinks the statute is unambiguous, it should rest on that premise.

In any event, the Court's suggestion that the FSIA does command retroactive application unambiguously is not right. The Court's interpretation of § 1602 takes the pertinent "henceforth" language in isolation. See *ante*, at 697–698. When that language instead is read in the context of the full section, it is quite clear that it does not speak to retroactivity. The section is as follows:

> "Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdic-

tion of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this [statute]."

The first two sentences in § 1602 describe the Act's intention to replace the former framework for sovereign immunity determinations with a new court-controlled regime. The third sentence, which contains the "henceforth" phrase, serves to make clear that the new regime replaces the old regime from that point on. Compare § 1602 ("immunity [claims] should henceforth be decided by [American] courts . . . in conformity with the [Act's] principles") with Webster's Third New International Dictionary 1056 (1976) (defining "henceforth" as "from this point on"). That does not address the topic of retroactivity.

If one of the Act's principles were that "the Act shall govern all claims, whenever filed, and involving conduct that occurred whenever in time," the provision would command retroactive application. A statement like this, however, cannot be found in the FSIA. The statute says only that it must be applied "henceforth." That says no more than that the principles immediately apply from the point of the Act's effective date on, the same type of command that *Landgraf* rejected as grounds for an express command of retroactive application. Cf. 511 U. S., at 257 (analyzing a statutory provision that provided it was to "'take effect upon enactment'"). As JUSTICE STEVENS noted for the Court in that case: "A statement that a statute will become effective on a certain date does not even arguably suggest that it has any application to conduct that occurred at an earlier date." *Ibid.*

In order for the term "henceforth" to command retroactivity, it would have to be accompanied by reference to specific proceedings or claims (*i. e.*, specific as to when they were commenced, if they are pending, or when they were determined). To confirm this one need only compare the FSIA's isolated use of the term "henceforth" to those statutory provisions that have been interpreted to require retroactive effect. See, *e. g.*, *Carpenter* v. *Wabash R. Co.*, 309 U. S. 23, 27 (1940) ("The statute applies to 'equity receiverships of railroad corporations now ... pending in any court of the United States'"); *Freeborn* v. *Smith*, 2 Wall. 160, 162 (1865) ("'all cases of appeal ... heretofore prosecuted and now pending in the Supreme Court of the United States ... may be heard and determined by the Supreme Court of the United States'"). See also *Landgraf,* 511 U. S., at 255–256 (explaining that before the FSIA was enacted, another bill was passed by Congress but vetoed by the President with "language expressly calling for [retroactive] application of many of its provisions"); *id.,* at 255, n. 8 (citing the following example of a provision containing an express command for retroactive applications: "'[These] sections ... shall apply to all proceedings pending on or commenced after the date of the enactment of this Act'"). On its own, "henceforth" does not speak with the precision and clarity necessary to command retroactivity.

JUSTICE BREYER's suggestion that Congress' intention as to retroactivity can be measured by the fact that the FSIA does not bear the same language as some other statutes and conventions Congress has authored does not change the analysis. See *ante,* at 708 (concurring opinion). To accept that interpretive approach is to abandon our usual insistence on a clear statement.

### B

Because the FSIA does not exempt itself from the usual rule against retroactivity with a clear statement, our cases require that we consider the character of the statute, and of

the rights and liabilities it creates, to determine if its application will impose retroactive effect on the parties. See *Landgraf*, 511 U. S., at 280 ("When . . . the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i. e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed"). If it does, we must refuse to apply it in that manner. *Ibid.*

The essential character of the FSIA is jurisdictional. The conclusion that it allows (or denies) jurisdiction follows from the language of the statute. See § 1602 (the Act involves "the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts"). By denying immunity in certain classes of cases—those in the Act's succeeding provisions—the FSIA, in effect, grants jurisdiction over those disputes. The Court as much as admits all this, saying that "the FSIA . . . opens United States courts to plaintiffs with pre-existing claims against foreign states." *Ante*, at 695.

The statute's mechanism of establishing jurisdictional effects (*i. e.*, either allowing jurisdiction or denying it) has important implications for the retroactivity question. On the one hand, jurisdictional statutes, as a class, tend not to impose retroactive effect. As the Court explained in *Landgraf*: "Application of a new jurisdictional rule usually 'takes away no substantive right but simply changes the tribunal that is to hear the case.' Present law normally governs in such situations because jurisdictional statutes 'speak to the power of the court rather than to the rights or obligations of the parties.'" 511 U. S., at 274 (citations omitted).

On the other hand, there is a subclass of statutes that, though jurisdictional, do impose retroactive effect. These are statutes that confer jurisdiction where before there was none. That is, they altogether create jurisdiction. We explained the distinction in a unanimous opinion in *Hughes*

*Aircraft Co.* v. *United States ex rel. Schumer*, 520 U. S. 939, 951 (1997) (citations omitted):

> "Statutes merely addressing *which* court shall have jurisdiction to entertain a particular cause of action can fairly be said merely to regulate the secondary conduct of litigation and not the underlying primary conduct of the parties. Such statutes affect only *where* a suit may be brought, not *whether* it may be brought at all. The 1986 amendment, however, does not merely allocate jurisdiction among forums. Rather, it *creates* jurisdiction where none previously existed; it thus speaks not just to the power of a particular court but to the substantive rights of the parties as well. Such a statute, even though phrased in 'jurisdictional' terms, is as much subject to our presumption against retroactivity as any other."

The principles of *Hughes Aircraft* establish that retroactivity analysis of a jurisdictional statute is incomplete unless it asks whether the provision confers jurisdiction where there was none before. Again, this is common ground between the majority and this dissent. The majority recognizes the import of *Hughes Aircraft*'s holding and affirms that courts may not apply statutes that confer jurisdiction over a cause of action for which no jurisdiction existed when the sued-upon conduct occurred. "Such statutes," the majority acknowledges, "'even though phrased in "jurisdictional" terms, [are] as much subject to our presumption against retroactivity as any other[s].'" *Ante*, at 695 (alterations in original) (quoting *Hughes Aircraft, supra*, at 951).

If the FSIA creates new jurisdiction, *Hughes Aircraft* controls and instructs us not to apply it to cases involving pre-enactment conduct. On the other hand, if the FSIA did not create new jurisdiction—including where it in fact stripped previously existing jurisdiction from the courts—we may apply its statutory terms without fear of working any retro-

active effect. See *Lindh* v. *Murphy,* 521 U. S. 320, 342–343, n. 3 (1997) (REHNQUIST, C. J., joined by SCALIA, KENNEDY, and THOMAS, JJ., dissenting) ("Although in *Hughes Aircraft* we recently rejected a presumption favoring retroactivity for jurisdiction-*creating* statutes, nothing in *Hughes* disparaged our longstanding practice of applying jurisdiction-*ousting* statutes to pending cases" (citation omitted)).

## C

To this point, then, I am in agreement with the Court on certain relevant points—the FSIA does not contain a clear retroactivity command; the statute is jurisdictional in nature; and jurisdictional statutes impose retroactive effect when they confer jurisdiction where none before existed. Now, however, our paths diverge. For though the majority concedes these critical issues, it does not address the question to which they lead: Does the FSIA confer jurisdiction where before there was none? Rather than asking that obvious question, the Court retreats to non sequitur. After this recitation of the *Hughes Aircraft* rule and with no causal reasoning from it, the Court concludes: "Thus, *Landgraf*'s default rule does not definitively resolve this case." *Ante,* at 696. It requires a few steps to undertake the analysis the Court omits, but in the end the proper conclusion is that, assuming the court on remand found immunity existed under the pre-FSIA regime, the statute does create jurisdiction where there was none before.

The analysis begins with 1948, when the conduct occurred. See *INS* v. *St. Cyr,* 533 U. S. 289, 321 (2001) ("[T]he judgment whether a particular statute acts retroactively 'should be informed and guided by "familiar considerations of fair notice, reasonable reliance, and settled expectations"'" (quoting *Martin* v. *Hadix,* 527 U. S. 343, 358 (1999), in turn quoting *Landgraf, supra,* at 270)). The parties' expectations were then formed by an emerging or common-law frame-

work governing claims of foreign sovereign immunity in American courts.

Parties in 1948 would have expected courts to apply this general law of foreign sovereign immunity in the future, and so also to apply whatever rules the courts "discovered" (if one subscribes to Blackstone's view of common law) or "created" (if one subscribes to Holmes') in the intervening time between the party's conduct and its being subject to suit. Compare 1 W. Blackstone, Commentaries *68 ("[T]he only method of proving, that this or that maxim is a rule of the common law, is by shewing that it hath been always the custom to observe it"), with Holmes, The Path of the Law, 10 Harv. L. Rev. 457, 466 (1897) ("Behind the logical form [of common-law decisionmaking] lies a judgment as to the relative worth and importance of competing legislative grounds, often an inarticulate and unconscious judgment, it is true, and yet the very root and nerve of the whole proceeding"). To conduct the analysis, then, we should ask how the jurisdictional effects the FSIA creates compare to those that would govern were the prior regime still in force.

There is little dispute that in 1948 foreign sovereigns, and all other litigants, understood foreign sovereign immunity law to support three valid expectations. (1) Nations could expect that a baseline rule of sovereign immunity would apply. (2) They could expect that if the Executive made a statement on the issue of sovereign immunity that would be controlling. And (3), they could expect that they would be able to petition the Executive for intervention on their behalf. See *National City Bank of N. Y.* v. *Republic of China*, 348 U. S. 356, 358–361 (1955) (summing up the Court's approach to sovereign immunity questions); *id.*, at 366–368 (Reed, J., dissenting) (summing up the same principles).

These three expectations were little different in 1976, before the FSIA was passed. The Tate Letter did announce the policy of restrictive foreign sovereign immunity, and this was an important doctrinal development. The policy, how-

ever, was within the second expectation that the Executive could shape the framework for foreign sovereign immunity. Under the second category, a foreign sovereign would have expected its immunity to be controlled by such a statement.

The Executive's post-Tate Letter practices and a statement by the Court confirm this is the correct way to understand both the operation of the general law of foreign relations and the expectations it built. After the Tate Letter's issuance, the Executive evaluated suits involving pre-Tate Letter conduct under the Letter's new standard when determining whether to submit suggestions of immunity to the courts. The Court, likewise, seems to have understood the Tate Letter to require this sort of application. In *National City Bank of N. Y.*, the Court suggested that the Letter governed in a case involving pre-1952 conduct, though careful consideration of the question was unnecessary there. 348 U. S., at 361.

The governing weight the Tate Letter had as a statement of Executive policy does not detract from the third expectation foreign sovereigns continued to have—that they could petition the Executive for case-specific statements. Thus, in *National City Bank of N. Y.* the Court took note that the Government had not submitted a case-specific suggestion as to immunity. See *id.*, at 364 ("[O]ur State Department neither has been asked nor has it given the slightest intimation that in its judgment allowance of counterclaims in such a situation would embarrass friendly relations with the Republic of China").

Today, to measure a foreign sovereign's expectation of liability for conduct committed in 1948, the Court should apply the three discussed, interlocking principles of law, which the parties then expected. The Court of Appeals did not address the question in this necessary manner. Rather than determining how the jurisdictional result produced by the FSIA differs from the result a court would reach if it applied the legal principles that governed before the enactment of

the FSIA, the court instead asked what the Executive would have done in 1948. See 317 F. 3d 954, 965 (CA9 2002) ("Determining whether the FSIA may properly be applied thus turns on the question whether Austria could legitimately expect to receive immunity from the executive branch of the United States"). That is not the appropriate way to measure Austria's expectations. It is an unmanageable inquiry; and it usurps the authority the Executive, as it is constituted today, has under the pre-FSIA regime. In essence, the Court of Appeals wrongly assumed responsibility for the political question, rather than confining its judgment to the legal one.

Answering the legal question, in contrast, requires applying the principles noted above: We assume a baseline of sovereign immunity and then look to see if there is any Executive statement on the sovereign immunity issue that displaces the presumption of immunity. There is, of course, at least one Executive statement on the issue that displaces the immunity presumption to some degree. It is the Tate Letter itself. By the Tate Letter the Executive established, as a general rule, that the doctrine of restrictive sovereign immunity would be followed. In general, the doctrine provided immunity for suits involving public acts and denied it for suits involving commercial or private acts. 26 Dept. State Bull., at 984. These principles control, as the Executive has taken no case-specific position in the instant matter. If petitioners' conduct would not be subject to suit under the Tate Letter principles, the FSIA cannot alter that result without imposing retroactive effect, creating new jurisdiction in American courts.

Petitioners and the United States, appearing as *amicus curiae*, argue that the Tate Letter doctrine would grant immunity (*i. e.*, deny jurisdiction) for suits involving expropriation. They say the Tate Letter rules contain no principle that parallels § 1605(a)(3), the FSIA's expropriation exception on which respondent relies to establish jurisdiction:

> "The expropriation exception . . . was a new development in the doctrine of sovereign immunity when the FSIA was enacted . . . . [I]n *Victory Transport Inc.* v. *Comisaria General de Abastecimientos y Transportes,* 336 F. 2d 354 (CA2 1964), cert. denied, 381 U. S. 934 (1965)[,] [t]he court explained that, even under the restrictive theory of sovereign immunity, foreign states continued to enjoy immunity with respect to . . . suits respecting the 'nationalization' of property." Brief for United States as *Amicus Curiae* 12.

This argument may be correct in the end; but, it should be noted, the petitioners' reliance on *Victory Transport Inc.* v. *Comisaria General,* 336 F. 2d 354 (CA2 1964), is not conclusive. *Victory Transport* does not say that nationalizations of property are *per se* exempt under the restrictive theory of sovereign immunity. The Court of Appeals for the Second Circuit said:

> "The purpose of the restrictive theory of sovereign immunity is to try to accommodate the interest of individuals doing business with foreign governments in having their legal rights determined by the courts, with the interest of foreign governments in being free to perform certain political acts without undergoing the embarrassment or hindrance of defending the propriety of such acts before foreign courts. . . . Such [immune] acts are generally limited to the following categories:
>
> .          .          .          .          .
>
> "(2) legislative acts, such as nationalization." *Id.,* at at 360 (citations omitted).

As the court's language makes clear, the pertinent category of exempt action is legislative action, of which nationalization was but one example. The expropriation alleged in this case was not a legislative act.

Petitioners can still prevail by showing that there would have been no jurisdiction under the pre-FSIA governing

principles. That could be established by showing that the conduct at issue was considered a public act under those principles and that the principles contain no expropriation exception similar to that codified in § 1605(a)(3), which would deny otherwise available immunity. We need not, and ought not, resolve the question in the first instance. Neither the District Court nor the Court of Appeals has yet addressed it. The issue is complex and would benefit from more specific briefing, arguments, and consideration of the international law sources bearing upon the scope of immunity the Tate Letter announced. I would vacate the judgment of the Court of Appeals and remand for further proceedings to consider the question.

D

By declaring that this statute is not subject to the usual presumption against retroactivity, and so avoiding the critical issue in this case, the Court puts the force and the validity of our precedent in *Hughes Aircraft* into serious question. The Court, in rejecting the usual analysis, states three rationales to justify its approach. The arguments neither distinguish this case from *Hughes Aircraft* nor suffice to explain rejecting the rule against retroactivity.

The Court suggests the retroactivity analysis should not apply because the rights at issue are not private rights. See *ante*, at 696 ("[The] antiretroactivity presumption, while not strictly confined to cases involving private rights, is most helpful in that context"). This is unconvincing. First, the language from *Landgraf* on which the Court relies undercuts its position. It confirms, in clear terms, that retroactivity presumptions work equally in favor of governments. Per JUSTICE STEVENS, the Court said:

"While the great majority of our decisions relying upon the antiretroactivity presumption have involved intervening statutes burdening private parties, we have applied the presumption in cases involving new monetary

obligations that fell only on the government." 511 U. S., at 271, n. 25.

Even if *Landgraf*'s reference to private rights could be read to establish that retroactivity analysis does not strictly protect government—and I do not see how that is possible in light of the above-quoted language—the *Landgraf* passage refers to the Federal Government. If the distinction mattered for retroactivity purposes, presumably it would have been on the basis that Congress, by virtue of authoring the legislation, is itself fully capable of protecting the Federal Government from having its rights degraded by retroactive laws. Private parties, it might be said, do not have the same built-in assurance. Here, of course, the Federal Government is not a party; instead a foreign government is. Foreign governments are as vulnerable as private parties to the disruption caused by retroactive laws. Indeed, foreign sovereigns may have less recourse than private parties to prevent or remedy retroactive legislation, since they cannot hold Congress responsible through the election process. The Court's private-rights argument, therefore, does not sustain its departure from our usual presumption against retroactivity.

The majority tries to justify departing from our usual principles in a second way. It argues that the purposes of foreign sovereign immunity are not concerned with allowing "foreign states and their instrumentalities to shape their conduct in reliance on the promise of future immunity." *Ante*, at 696. JUSTICE BREYER takes the suggestion further. He argues not that foreign sovereign immunity doctrine is not concerned with reliance interests but, even further, that in fact foreign sovereigns have no reliance interests in receiving immunity in our courts. See *ante*, at 709–711. This reasoning overlooks the plain fact that there are reliance interests of vast importance involved, interests surely as important as those stemming from contract rights between two private parties. As the Executive has made

clear to us, these interests span a range of time after the conduct, even up to the present day. See Brief for United States as *Amicus Curiae* 8. For example, at stake may be pertinent treaty rights and international agreements intended to remedy the earlier conduct. These are matters in which the negotiating parties may have acted on a likely assumption of sovereign immunity, as defined and limited by pre-FSIA expectations: "[The] conduct at issue [has been] extensively addressed through treaties, agreements, and separate legislation that were all adopted against the background assumption [of the pre-FSIA foreign sovereign immunity regime]." *Ibid.* Lurking in the Court's and JUSTICE BREYER's contrary suggestions is the implication that the expectations of foreign powers are minor or infrequent. Surely that is not the case. By today's decision the Court opens foreign nations worldwide to vast and potential liability for expropriation claims in regards to conduct that occurred generations ago, including claims that have been the subject of international negotiation and agreement. There are, then, reliance interests of magnitude, which support the usual presumption against retroactivity.

In addition, the statement that the purposes of foreign sovereign immunity have not much to do with the presumption against retroactivity carries little weight; the presumption against retroactivity has independent justification. The Court has noted this, saying that the purposes of the underlying substantive law are not conclusive of the retroactivity analysis. "It will frequently be true . . . that retroactive application of a new statute would vindicate its purpose more fully. That consideration, however, is not sufficient to rebut the presumption." *Landgraf,* 511 U. S., at 285–286. As a result, diminished concerns of unfair surprise and upset expectations—even assuming they existed—do not displace the usual presumption. That is why in *Landgraf,* though "concerns of unfair surprise and upsetting expectations [were] attenuated in the case of intentional employment discrimina-

tion, which ha[d] been unlawful for more than a generation," the Court concluded, nevertheless, that it could not give the statute retroactive effect. *Id.*, at 282–283, n. 35.

The Court, lastly, adds in a footnote that the "FSIA differs from the statutory amendment at issue in *Hughes Aircraft*" because in *Hughes Aircraft* the jurisdictional limitation attached directly to the cause of action and so ensured that suit could be brought only in accordance with the jurisdictional provision (and any changes to it). *Ante*, at 695, n. 15. With the FSIA, in contrast, the jurisdictional limitation is not attached to the cause of action. The result, the Court implies, is that even if a pre-FSIA jurisdictional bar applied in American courts, suit on the California cause of action might still have been able to have been brought in foreign courts, and such availability of suit would defeat retroactivity concerns. *Ante*, at 695–696, n. 15 ("The Act does not . . . purport to limit *foreign* countries' decisions about what claims against which defendants their courts will entertain"); see also *ante*, at 703 (SCALIA, J., concurring). What is of concern in the retroactivity analysis that *Hughes Aircraft* sets out, however, is the internal integrity of American statutes, not of whether an American law allows suit where before none was allowed elsewhere in the world. This is unsurprising, as the task of canvassing what causes of action foreign countries might have allowed before a new jurisdictional regime made such suits also viable in American courts would be a most difficult task to assign American courts.

In the end, the majority turns away from our usual retroactivity analysis because "this [is a] *sui generis* context." *Ante*, at 696. Having created a new, extra exception that frees it from the usual analysis, it can conclude simply that the usual rule "does not control the outcome in this case." *Ante*, at 692. The implications of this holding are not entirely clear, for the new exception does not rest on any apparent principle.

There is a stark contrast between the Court's analysis and that of the Courts of Appeals that have addressed the question. In this case the Court of Appeals for the Ninth Circuit, like every other Court of Appeals to have considered the question, concluded that the FSIA must be interpreted under the usual retroactivity principles, just like any other statute. See 317 F. 3d 954. Accord, *Hwang Geum Joo* v. *Japan*, 332 F. 3d 679 (CADC 2003); *Carl Marks & Co.* v. *Union of Soviet Socialist Republics*, 841 F. 2d 26 (CA2 1988) *(per curiam); Jackson* v. *People's Republic of China*, 794 F. 2d 1490 (CA11 1986).

The conclusion to which the *sui generis* rule leads the Court shows the rule lacks a principled basis: "[W]e think it more appropriate, absent contraindications, to defer to the most recent [decision by the political branches on the foreign sovereign immunity question]—namely, the FSIA." *Ante,* at 696. The question, however, is not whether the FSIA governs, but how to interpret the FSIA. The Court seems to think the FSIA implicitly adopts a presumption of retroactivity, though our cases instruct just the opposite. "[I]n *Hughes Aircraft* . . . we . . . rejected a presumption favoring retroactivity for jurisdiction-*creating* statutes." *Lindh,* 521 U. S., at 342, n. 3 (REHNQUIST, C. J., joined by SCALIA, KENNEDY, and THOMAS, JJ., dissenting).

JUSTICE BREYER would supplement the rationale for the Court's deciding the case outside the bounds of our usual mode of retroactivity analysis. He says the Court can take this path because sovereign immunity "is about a defendant's *status* at the time of suit, not about a defendant's *conduct* before the suit." *Ante,* at 708. The argument is a variant of that made by respondent. See Brief for Respondent 27 ("*Dole Food* controls the result in this case"). Respondent's argument fails, of course, because in this case the defendants' status at the time of suit is that of the sovereign, not that of private parties. That distinction alone makes misplaced reliance on *Dole Food Co.* v. *Patrickson,* 538 U. S. 468 (2003)

(holding that a now-private corporation could not assert sovereign immunity in a suit involving events that occurred when the entity was owned by a foreign sovereign). JUSTICE BREYER's further reasoning, however, is also unacceptable. When jurisdictional rules are at stake, status and conduct factors will at times intersect. Most assuredly, we would not disown the usual retroactivity principles in a case involving a status-based jurisdictional statute that creates jurisdiction over private litigants where before there was none simply because the creation of jurisdiction turned in part on the status of one of the litigants. JUSTICE BREYER's additional rationale, however, has this very implication.

We should not ignore the statutory retroactivity analysis just because the parties and the Court have failed to consider it before. See *ante*, at 710 (BREYER, J., concurring) (relying on the fact that in *Verlinden* the Court applied the FSIA to a contract that predated the Act). " '[T]his Court has never considered itself bound [by prior *sub silentio* holdings] when a subsequent case finally brings the jurisdictional issue before us.' *Hagans* v. *Lavine*, 415 U. S. 528, 535, n. 5 (1974)." *Will* v. *Michigan Dept. of State Police*, 491 U. S. 58, 63, n. 4 (1989) (alteration in original). Reliance on the fact that the immunity principles were applied retroactively in the common-law context of the pre-FSIA regime is also irrelevant. See *ante*, at 709–710 (BREYER, J., concurring). This case concerns the retroactive effect of enacted statutory law, not of court decisions interpreting the common law.

### III

Today's decision contains another proposition difficult to justify and that itself does considerable damage to the FSIA. Abandoning standard retroactivity principles, the Court attempts to compensate for the harsh results it reaches by inviting case-by-case intervention by the Executive. This does serious harm to the constitutional balance between the political branches.

The Court says that the Executive may make suggestions of immunity regarding FSIA determinations and implies that courts should give such suggestions deference. See *ante*, at 702 ("[S]hould the State Department choose to express its opinion on the implications of exercising jurisdiction over *particular* petitioners in connection with *their* alleged conduct, that opinion might well be entitled to deference as the considered judgment of the Executive" (footnote omitted)). That invitation would be justified if the Court recognized that the Executive's role was retrospective only, *i. e.*, implicated only in suits involving preenactment conduct and only as a means for resolving the retroactivity analysis. The law that governed before the FSIA's enactment allowed unilateral Executive authority in that regard. The Court's rejection of the *Landgraf* analysis, however, removes the possibility of that being the basis for the invitation.

The Court instead reaches its conclusion about the Executive's role by reliance on the general constitutional principle that the Executive has a "'"vast share of responsibility for the conduct of our foreign relations."'" *Ante*, at 702 (quoting *American Ins. Assn.* v. *Garamendi*, 539 U. S. 396, 414 (2003)). This prospective constitutional conclusion, which the Court offers almost as an aside, has fundamental implications for the future of the statute and raises serious separation-of-powers concerns.

The question the Court seems inclined to resolve—can the foreign affairs power of the Executive supersede a statutory scheme set forth by Congress—is simply not presented by the facts of this case. We would confront the question only if the case involved postenactment conduct and if the Executive had filed a suggestion of immunity, which, by its insistence, superseded the statute's directive. Those circumstances would present a difficult question. Compare U. S. Const., Art. II, § 2, with Art. I, § 1; *id.*, § 8, cls. 3, 9–11, 18; Art. III, § 1; *id.*, § 2, cl. 1. See also H. R. Rep., at 12 (setting out the constitutional authority on which Congress relied to

enact the FSIA). See generally *International Bancorp, LLC* v. *Societe des Bains de Mer et du Cercle des Etrangers*, 329 F. 3d 359, 367–368 (CA4 2003) (noting the complicated intersection where the Executive's and the Legislature's foreign affairs responsibilities overlap, in a case involving foreign trade). The separation-of-powers principles at stake also implicate judicial independence, which is compromised by case-by-case, selective determinations of jurisdiction by the Executive.

The Court makes a serious mistake, in my view, to address the question when it is not presented. It magnifies this error by proceeding with so little explanation, particularly in light of the strong arguments against its conclusion. The Solicitor General, on behalf of the Executive, agrees that the statute "presents the sole basis for civil litigants to obtain jurisdiction over a foreign state in United States courts." Brief for United States as *Amicus Curiae* 1. This understanding is supported by the lack of textual support for the contrary position in the Act and by the majority's own assessment of the Act's purposes.

The Court's abrupt announcement that the FSIA may well be subject to Executive override undermines the Act's central purpose and structure. As the Court acknowledges, before the Act, "immunity determinations [had been thrown] into some disarray, as 'foreign nations often placed diplomatic pressure on the State Department,' and political considerations sometimes led the Department to file 'suggestions of immunity in cases where immunity would not have been available under the restrictive theory.'" *Ante,* at 690 (quoting *Verlinden,* 461 U. S., at 487). See also *supra,* at 716–717. Congress intended the FSIA to replace this old and unsatisfactory methodology of Executive decision-making. *Ibid.* The President endorsed the objective in full, recommending the bill upon its introduction in Congress, H. R. Rep., at 6, and signing the bill into law upon its presentment. The majority's surprising constitutional con-

clusion suggests that the FSIA accomplished none of these aims. The Court states that the statute's directives may well be short circuited by the sole directive of the Executive.

The Court adds a disclaimer that it "express[es] no opinion on the question whether such deference should be granted [to the Executive] in cases covered by the FSIA." *Ante*, at 702. The disclaimer, however, is inadequate to remedy the harm done by the invitation, for it is belied by the Court's own terms: Executive statements "suggesting that courts decline to exercise jurisdiction in particular cases implicating foreign sovereign immunity . . . might well be entitled to deference as the considered judgment of the Executive on a particular question of foreign policy." *Ante*, at 701–702 (citing as an example a case in which Executive foreign policy superseded state law). Taking what the Court says at face value, the Court does express an opinion on the question: Its opinion is that the Executive statement may well be entitled to deference, and so may well supersede federal law that gives courts jurisdiction.

If, as it seems, the Court seeks to free the Executive from the dictates of enacted law because it fears that to do otherwise would consign some litigants to an unfair retroactive application of the law, it adds illogic to the illogic of its own creation. Only application of our traditional analysis guards properly against unfair retroactive effect, "ensur[ing] that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness." *Landgraf*, 511 U. S., at 268.

Where postenactment conduct is at stake, the majority's approach promises unfortunate disruption. It promises to reintroduce Executive intervention in foreign sovereign immunity determinations to an even greater degree than existed before the FSIA's enactment. Before the Act, foreign nations only tended to need the Executive's protection from the courts' jurisdiction in instances involving private acts. The Tate Letter ensured their public acts would remain im-

mune from suit, even without Executive intervention. Now, there is a potential for Executive intervention in a much larger universe of claims. The FSIA has no public act/private act distinction with respect to certain categories of conduct, such as expropriations. Foreign nations now have incentive to seek Executive override of the Act's jurisdictional rules for both public and private acts in those categories of cases.

With the FSIA, Congress tried to settle foreign sovereigns' prospective expectations for being subject to suit in American courts and to ensure fair and evenhanded treatment to our citizens who have claims against foreign sovereigns. See *supra*, at 716–717. This was in keeping with strengthening the Executive's ability to secure negotiated agreements with foreign nations against whom our citizens may have claims. Over time, agreements of this sort have been an important tool for the Executive. See, *e. g.*, Agreement Relating to the Agreement of Oct. 24, 2000, Concerning the Austrian Fund "Reconciliation, Peace and Cooperation," Jan. 23, 2001, U. S.-Aus., 2001 WL 935261 (settling claims with Austria); Claims of U. S. Nationals, Nov. 5, 1964, U. S.-Yugo., 16 U. S. T. 1, T. I. A. S. No. 5750 (same with Yugoslavia); Settlement of Claims of U. S. Nationals, July 16, 1960, U. S.-Pol., 11 U. S. T. 1953, T. I. A. S. No. 4545 (same with Poland). Uncertain prospective application of our foreign sovereign immunity law may weaken the Executive's ability to secure such agreements by compromising foreign sovereigns' ability to predict the liability they face in our courts and so to assess the ultimate costs and benefits of any agreement. See *supra*, at 729–730 (citing Brief for United States as *Amicus Curiae*).

\*     \*     \*

The presumption against retroactivity has comprehended, and always has been intended to comprehend, the wide universe of cases that a court might confront. That includes

this one. The Court's departure from precedent should not be overlooked. It has disregarded our "widely held intuitions about how statutes ordinarily operate," *Landgraf, supra,* at 272, and treated the principles discussed in *Landgraf* as if they describe a limited and precise rule that courts should apply only in particularized contexts. Our unanimous rejection of this approach in *Hughes Aircraft* applies here as well:

> "To the extent [the Court] contends that *only* statutes with one of [*Landgraf's* particularly stated] effects are subject to our presumption against retroactivity, [it] simply misreads our opinion in *Landgraf.* The language upon which [it] relies does not purport to define the outer limit of impermissible retroactivity. Rather, our opinion in *Landgraf,* like that of Justice Story, merely described that any such effect constituted a *sufficient,* rather than a *necessary,* condition for invoking the presumption against retroactivity." 520 U. S., at 947.

The Court's approach further leads to the unprecedented conclusion that Congress' Article I power might well be insufficient to accomplish the central objective of the FSIA. The Court, in addition, injects great prospective uncertainty into our relations with foreign sovereigns. Application of our usual presumption against imposing retroactive effect would leave powerful precedent intact and avoid these difficulties.

With respect, I dissent.