BOLIN, Justice
(concurring in the result). ,
I agree with the majority that the juvenile courts' of this State have jurisdiction over a termination-of-parental rights petition when the grounds for the petition do not involve a child alleged “to have committed a delinquent act, to be dependent, or to be in need of supervision.” § 12-15-114(a), Ala.Code 1975, a provision of the Alabama Juvenile Justice Act, § 12-15-101 et seq., Ala.Code 1975 (“the AJJA”). However, I believe that Act No. 2014-350, Ala. Acts 2014, which amended the AJJA and which became effective while this appeal was pending (“the 2014 amendments”), establishes that the juvenile courts have jurisdiction over- all petitions seeking the termination of parental rights, even as between the parents. The legislature, in expressing its intent that the 2014 amendments apply retroactively, also stated that those amendments are “curative.” That is, the 2014 amendments, in my opinion, remedy any jurisdictional conflict created by the Court of Civil Appeals’ holding that a fit custodial parent could not bring a termination-of-parental-rights petition against the other parent because the child of the fit custodial parent could not be considered “dependent,” ,i.e., in need of care and supervision.
■ I recognize that retroactive application of a statute is generally not favored, absent an express statutory • provision or clear legislative intent that the enactment apply both retroactively and prospectively. See Ex parte Bonner, 676 So.2d 925 (Ala. 1995) (statutory amendment providing for the waiver of the cost of a bond upon a showing of' substantial hardship applied retroactively); Jones v. Casey, 445 So.2d 873 (Ala.1983)(statutory amendment raising the interest rate on judgments did not apply retroactively). “The general rule is that retrospective application of a statute is not favored and legislative intent to make a statute retrospective must be clearly expressed before the statute will be construed "to operate retrospectively.” Kittrell v. Benjamin, 396 So.2d 93, 94 (Ala. 1981) (statute allowing a sale of property for division of proceeds applied retroactively).
The United States Supreme Court in Landgraf v. USI Film Products, 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), considered whether an amendment *198 to the Civil Rights Act of 1991, which permitted a party to seek compensatory and punitive damages for certain types of intentional employment discrimination and to demand a jury trial if such damages are sought, applied to an employment-discrimination case that was pending on appeal when the amendment became effective. The Supreme Court in Landgmf stated: “When a case implicates a federal statute enacted after the events in suit, the court’s first task is to determine whether Congress has expressly prescribed the statute’s proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules.” 511 U.S. at 280. The Landgmf Court went on to set out the applicable analysis when the statute contains no such expressed intent. See also Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) (discussing Landgmf and the rules of statutory construction used to ascertain a statute’s temporal scope).
In the present case, the legislature expressed its clear intent that the 2014 amendments apply retroactively.
“[Wjhen a lawmaking body thoughtfully considers the burdens and benefits of retroactively applying a law and makes clear its intent that the law have legal consequence in pending cases, courts must follow the law’s intent. See Landgraf v. USI Film Prods., 511 U.S. 244, 272, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). This is especially true in cases that merely change the jurisdiction from one forum to another.
“ ‘We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction ■lay when the underlying conduct oc-' curred or when the suit was filed.... Application of a new jurisdictional rule usually “takes away no substantive right but simply changes the tribunal that is to hear the case.” ’
“Landgraf, 511 U.S. at 274, 114 S.Ct. 1483 (citing Hallowell v. Commons, 239 U.S. 506, 36 S.Ct. 202, 60 L.Ed. 409 (1916)).”
Dickinson v. Cosmos Broad. Co., 782 So.2d 260, 269 (Ala.2000) (retroactive application of federal agency’s declaratory ruling did not violate plaintiffs’ due-process rights).
The next question is whether retroactive application is constitutionally permissible. Retroactive application is prohibited regardless of legislative intent if so applying the statute would impair vested rights or create new obligations.
In Harlan v. State, 31 Ala.App. 478, 18 So.2d 744 (1944), the Court of Appeals .explained that a retrospective law is one that takes away or impairs vested rights acquired under existing laws or creates a new obligation and imposes a new duty or attaches a new disability in light of consid-ex-ations or transactions already past. In contrast, “ ‘[rjemedial statutes — those which do not create, enlarge, diminish, or destroy vested rights — are favored by the courts, and their retrospective operation is not obnoxious to the spirit and policy of the law.’ ” Ex parte Burks, 487 So.2d 905, 907 (Ala.1985) (quoting Barrington v. Barrington, 200 Ala. 315, 316, 76 So. 81, 82 (1917)). Remedial statutes are exemplified by those that “ ‘impair no contract or vested right, ... but presence and enforce the right and ■ heal defects in existing laws prescribing remedies.’” Jones v. Casey, 445 So.2d 873, 875 (Ala.1983) (quoting Dickson v. Alabama Mach. & Supply Co., 18 Ala.App. 164, 165, 89 So. 843, 844 (1921)). A remedial statute “may be applied on appeal, even if the effective date of that statute occurred while the appeal was pending, and even if the effective date of the statute was after the judgment in *199 the trial court.” Kittrell v. Benjamin, 396 So.2d at 95.
The Landgraf Court stated that a statute has retroactive effects if the statute
“attaches new legal consequences to events completed before its enactment. The conclusion that a particular rule operates ‘retroactively* comes at the end of a process of judgment concerning the nature and extent of the change in the law and the degree of connection between the operation of the new rule and a relevant past event.... '[FJamiliar considerations of fair notice, reasonable reliance, and settled expectations ■ offer sound guidance.”
Landgraf, 511 U.S. at 270.
The Supreme Court in Landgraf also noted jurisdiction-conferring and jurisdiction-ousting statutes as examples of statutes often properly applied to pre-enactment events. “Application of a new jurisdictional rule,” the Court instructed, “usually takes away no substantive right but simply changes the tribunal that is to hear the case.” 511 U.S. at 274. Additionally, “[pjresent law normally governs in such situations because jurisdictional statutes speak to the power of the court rather than to the rights or obligations of the parties.” Id.
Three years after Landgraf, the United States Supreme Court in Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), applied and clarified the Landgraf analysis for determining retroactivity. The Lindh Court further elaborated on the distinction between procedural and substantive changes. The Supreme Court noted that if- a statute is “merely procedural in a strict sense (say, setting deadlines for filing and disposition ...), the natural expectation would be that it would apply to pending cases.” 521 U.S. at 327 (citing Landgraf, 511 U.S. at 275). But because the Court found that the statutory changes at issue in Lindh — the “revisions of prior law to change standards of proof and persuasion in a way favorable to a State” — went “beyond ‘mere’ procedure to affect substantive entitlement to relief,” it held that the statute did not fall within the Court’s “express (albeit qualified) approval of applying such statutes to pending cases.” 521 U.S. at 327-28. Instead, the Supreme Court relied on what it held to be a clear expression of congressional intent that the amendments to chapter 153 effected by the Antiterrorism and Effective Death Penalty Act (“the AEDPA”) not apply to noncapital .cases that were already pending when the AEDPA was enacted. The Court explained, “[t]he statute reveals Congress’s intent to apply the amendments to chapter 153 only to such cases as were filed after the statute’s enactment.” 521 U.S. at 326.
In Hughes Aircraft Co. v. United States, 520 U.S. 939, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997), the Supreme Court confirmed that the general presumption against ret-roactivity affects jurisdiction-allocating statutes to the same extent it affects other legislation. The issue in Hughes Aircraft was a 1986 amendment to the False Claims Act that expanded the range of circumstances under which private" parties can bring suit “on behalf of the United States against anyone submitting a false claim to the Government.” 520 U.S. at 941. Congress did not make its intention regarding retroactivity clear, and, after conducting the analysis outlined in Landgraf, the Supreme Court concluded that the 1986 amendment did not apply where the defendant had submitted, the alleged false claims before 1986 and a private person could not have brought suit based on *200 those claims under the pre-amendment version of the False Claims Act. 520 U.S. at 946-51.
In rejecting the plaintiffs argument that the 1986 amendment was exempt from the Landgraf presumption against retroactivity because the statute it amended was a jurisdictional statute, the Supreme Court clarified Landgraf, stating:
“The fact that courts often apply newly enacted jurisdiction-allocating statutes to pending cases merely evidences certain limited circumstances failing to meet the conditions for our generally applicable presumption against retroac-tivity, not an exception to the rule it-self_As we stated in Landgraf-
“ ‘Application of a new jurisdictional rule usually “takes away no substantive right but simply changes the tribunal that is to hear the case.” Present law normally governs in such situations because jurisdictional statutes “speak to the power of the court rather than to the rights or obligations of the parties.” ’
“Statutes merely addressing which court shall have jurisdiction to entertain a particular cause of action can fairly be said merely to regulate the secondary conduct of litigation and not the underlying primary conduct of the parties. Such statutes affect only where a suit may be brought, not whether it may be brought at all. The 1986 amendment, however, does not merely allocate jurisdiction among forums. Rather, it creates jurisdiction where none previously existed; it thus speaks not just to the power of a particular court but to the substantive rights of the parties as well. Such a statute, even though phrased in ‘jurisdictional’ terms,- is as much subject to our presumption against retroactivity as any other.”
Hughes Aircraft, 520 U.S. at 951 (citation omitted).
In Republic of Austria v. Altmann, 541 U.S. 677, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004), the Supreme Court addressed whether the Federal Service Immunity Act (“the FSIA”) applied to conduct that occurred prior to the enactment of the FSIA in 1976. The plaintiff in Altmann sued the Republic of Austria for expropriating, before and after World War II, paintings owned by her family. Austria asserted sovereign immunity as a defense. In answering the question, the Supreme Court looked to the FSIA and noted that the preamble suggested that it applied to pre-enactment conduct but that it fell short of -an express prescription of the Statute’s temporal reach. The Supreme Court applied Landgraf and asked whether the FSIA affected substantive rights and would be impermissibly retroactive if applied to pre-enactment conduct or addressed procedural matters and may be applied to all pending cases, regardless of when the underlying conduct occurred. The Court noted that under Landgraf there is a presumption against retroactivity if Congress has. not expressly stated that the statute is to have retroactive effect and the statute affects rights, liabilities, or duties with respect to past conduct. 541 U.S. at 693-94 (citing Landgraf, 511 U.S. at 280). On the other hand, the Supreme Court noted that the application of a statute to future as well as to pending cases would be sanctioned if the statute merely confers or ousts jurisdiction. 541 U.S. at 693. The Supreme Court concluded that, although these principles seemed comprehensive, they did not provide a clear answer in the case before it, because the FSIA could not be categorized as exclusively affecting either substantive rights or procedural matters. 541 U.S. at 694. *201 The Supreme Court then noted that the purpose of the anti-retroactivity1 presumption is “to avoid unnecessary post hoc changes to legal rules on which parties relied in shaping their primary conduct” and that that had never been the purpose of foreign sovereign immunity. 541 U.S. at 696. Rather, the Supreme Court stated, foreign sovereign immunity aims to protect foreign states “ ‘from the inconvenience of suit as a gesture of comity.’ ” 541 U.S. at 696 (quoting Dole Food Co. v. Patrickson, 538 U.S. 468, 479, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003)). The Supreme Court then looked to the FSIA and the circumstances surrounding its enactment for any suggestion that it should not apply to the 1948 conduct by Austria refusing to return the paintings at issue. 541 U.S. at 697. In holding that the FSIA applies “to all pending cases regardless of when the underlying conduct occurred,” the Supreme Court relied on “[t]he FSIA’s overall structure” as well as “two of the Act’s principal purposes: clarifying the rules that judges should apply in resolving sovereign immunity claims and eliminating political participation in the resolution of such claims.” 541 U.S. at 698-99. The Supreme Court also looked to Congress’s understanding of the FSIA as noted in its preamble, which provides that “ ‘[cjlaims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in’ ” the FSIA. 54Í U.S. .at 697 (quoting 28 U.S.C. § 1602). The Supreme Court noted that pursuant to this language in the FSIA “[ijmmunity ‘claims’ — not actions protected by immunity, but assertions of immunity to suits arising from those actions — are the relevant conduct regulated by the [FSIA].” Id.
In Hamdan v. Rumsfeld, 548 U.S. 557, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006), the Supreme Court addressed the Detainee Treatment Act of 2005 (“the DTA”), in particular '§ 1005(e)(1) of the DTA, which provided that no court shall have jurisdiction to hear an application for habeas corpus filed by an alien detained at Guantanamo Bay. No provision of the DTA stated whether subsection (e)(1) applied to pending cases. The government argued that this subsection had the immediate effect, upon enactment, of repealing federal jurisdiction over detainee actions pending in any federal court. The Supreme Court decided that Congress’s failure to include language that subsection (e)(1) applied to pending .habeas actions was a deliberate choice. The Supreme Court refused to dismiss Hamdan’s habeas case for lack of jurisdiction because it was pending when the DTA was enacted. In response to the Hamdan decision, Congress passed the Military Commissions Act, of 2006 (“the MCA”), which amended' 28 U.S.C. § 2241(e), stripping jurisdiction of the federal courts over pending habeas corpus petitions and expressing its intent to apply the amendments in all pending cases. In Boumediene v. Bush, 553 U.S. 723, 738, 128 S.Ct. 2229, 171 L.Ed.2d 41 (2008), the Supreme Court stated: “[W]e cannot ignore that the MCA was a direct response to Hamdan’s holding that the DTA’s jurisdiction-stripping provision had ho application to pending cases.” Ultimately, the Supreme Court concluded that the amendments stripping the federal courts of jurisdiction to hear habeas corpus petitions filed by enemy combatants were an unconstitutional suspension of the writ of habeas corpus under Article I, § 9, of the United States Constitution.
In the present case, former § 12-15-30(a), Ala.Code 1975 (repealed), gave the juvenile courts exclusive original jurisdiction over proceedings for the termination *202 of parental rights. Former § 26-18-5, Ala.Code 1975 (repealed), a provision of the Child Protection Act, permitted a parent to bring a termination-of-parental-rights proceeding, and our caselaw concluded that the finding of dependency when one parent sought to terminate the other parent’s parental rights was not necessary. Ex parte Beasley, 564 So.2d 950 (Ala.1990). The 2008 amendments to an earlier version of the Juvenile Justice Act, which resulted in the AJJA, set out the juvenile court’s exclusive original jurisdiction over termination-of-parental-rights proceedings in § 12-15-114. Those same 2008 amendments provided a parent with the right to' bring a termination-of-parental-rights action. See § 12-15-317, Ala. Code 1975. However, § 12-15-114 purported to limit the juvenile court’s jurisdiction to termination proceedings “arising out of’ allegations of delinquency, dependency, or a child in need of supervision. A majority of the Court of Civil Appeals essentially concluded in this case that, because a fit custodial parent could not allege dependency, then the juvenile court lacked jurisdiction over the petition filed by L.J. (“the mother”) seeking to terminate the parental rights of C.C. (“the father”) under the 2008 amendments. C.C. v. L.J., 176 So.3d 183 (Ala.Civ.App.2013). The 2014 amendments amended § 12-15-114 to clarify that the juvenile court had jurisdiction over all termination-of-p'arental-rights actions and expressed the legislature’s intent that the amendments were to apply retroactively.
I discern no constitutional impediment to retroactively applying the 2014 amendments to § 12-15-114. In addressing ret-roactivity, a court is concerned with “familiar considerations of fair notice, reasonable reliance, and settled expectations.” Landgraf, 511 U.S. at 270. The juvenile court continues to have exclusive original jurisdiction over termination-of-parental-rights proceedings as it did before and after the 2014 amendments. The 2014 amendments do not take away or give the right to a parent to bring a termination proceeding because § 12-15-317 already provides for such. I believe that applying the 2014 amendments retroactively gives effect to the clear intent of the legislature, which included in the 2014 amendments express language regarding retroactivity, ensuring that the legislature considered whether the benefits of retroactivity outweighed any potential unfairness.
The father argues that “legislation that so boldly robs a father of such a powerful defense [lack of jurisdiction] clearly affects his substantive, vested rights if applied retroactively.” However, “jurisdictional statutes ‘speak to the power of the court rather than to the rights or obligations of the parties.’ ” Landgraf, 511 U.S. at 274 (quoting Republic Nat'l Bank of Miami v. United States, 506 U.S. 80, 100, 113 S.Ct. 554, 121 L.Ed.2d 474 (Thomas, J., concurring)). Jurisdiction is not a right possessed by the parties, but is instead the power of the court. The Supreme Court has “regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed.” Landgraf, 511 U.S. at 274. The Supreme Court has established the principle that in determining retroactivity jurisdictional statutes should be evaluated in the same manner as any other statute. Thus, in order to determine whether a statute applies to a case that was filed prior to the enactment of the statute, courts must determine whether the statute is “procedural” in nature or whether it affects “substantive entitlement to relief.” Lindh, 521 U.S. at 327. Does the statute merely “regulate the secondary conduct of litigation” or does it affect “the underlying *203 primary conduct of the parties”? Hughes, 520 U.S. at 951. Does the statute speak “just to the power of a particular court,” or does it speak to “the substantive rights of the parties as well”? Hughes, 520 -U.S. at 951. In this case, the 2014 amendments speak to jurisdiction.
The father argues that the 2014 amendments violate the separation-of-powers doctrine and cites Barrington, v. Barrington, 200 Ala. 315, 76 So. 81 (1917). In Barrington, a new statute meant to protect women from actual or threatened violence granted the wife a divorce when she, without support from the husband, had lived separate and apart from the bed and board of her husband for five years preceding the filing for divorce. Although the wife had lived “separate and apart” from the husband for five years, the new statute authorizing divorce under such circumstances had not been in effect for five years at the time she filed for divorce. The husband demurred, asserting that to permit divorce under the new statute would constitute a constitutionally prohibited retroactive application of a statute that was not, on its face, retroactive. The Court agreed, stating: “We are, upon these considerations, constrained to hold that the statute in question authorizes the divorce here sought only upon the lapse of five years from and after the date of its enactment — September 10, 1915.” Barrington, 200 Ala. at 318, 76 So. at 84. The statute that was under consideration in Barrington, however, is readily distinguishable from the 2014 amendments, which are not only expressly retroactive, but also do not alter vested rights (i.e., contract or property rights). In contrast, the new statute in Barrington was not expressly retroactive, and it did alter vested property rights:
“The legislative act here involved is not remedial in character, but gives legal effect to marital conduct and relations, by converting any complete separation between husband and wife for five years next before the filing of the bill of complaint, into an authorized ground of divorce in favor of the wife, if she has so lived without support from him. It falls fairly within the class of acts whose retrospective operation is so strongly disfavored by the law, and so consistently reprobated by the courts.”
200 Ala. at 316, 76 So. at 82. The Court went on to say:
“Remedial statutes — those which do not create, enlarge, diminish, or destroy vested rights — are favored by , the courts,- and their retrospective operation is not obnoxious to the spirit and policy of the law.
“But a statute which gives a new legal effect to conduct or conditions occurring or existing prior to its enactment, thereby imposing upon any person unanticipated disabilities or alterations of legal status, is retrospective in a sense which is odious to the law, and, as to such operation, is strongly disfavored by the courts, even though it does not offend the Constitution by impairing the obligation of a contract or by creating a crime or punishment ex post facto. This disfavor.has everywhere found expression in a rigorous rule of construction which denies retroactive effect to such a statute unless by its express terms, or by unmistakable implication, the Legislature must have so intended.”
Barrington, 200 Ala. at 316, 76 So. at 82. In the present case, the 2014 amendments do not give new legal effect to abandonment by a parent.
In arguing that the 2014 amendments violate the separation-of-powers doctrine, the father refers this Court to Justice *204 Mayfield’s special concurrence in Barring-ton, in which he stated:
“Granting divorces is the-exercise of powers and- functions1 either legislative or judicial. If legislative, under our Constitution, then only the Legislature can exercise them, the courts cannot; if judicial, then only the courts or the judicial department of the state can exercise the powers. Assuredly, the power or function to decree divorces does not. belong to both these branches.of government. I take it that there never would have been a doubt on this subject but for the fact that in England Parliament has for centuries granted divorces; but this does not prove that it is the exercise of legislative powers, because Parliament — different in this from all American Legislatures, state or federal — exercises both legislative and judicial powers and functions of the English government. Our Constitution, like most all other written American Constitutions, expressly prohibits the Legislature from exercising judicial powers, and also prohibits the judicial department from exercising legislative powers. So it results that granting divorces, under the law of this state, is the exercise of powers and functions of the state government, either legislative or judicial, and that it cannot be the exercise of both classes óf powers. If it be a judicial power and function, the Legislature cannot usurp it by saying that the courts shall grant divorces without cause, and without any issuable fact being alleged or proven.
“The Legislature may prescribe rules under which judicial power shall be exercised, but it cannot authorize courts to proceed to judgment against, or to adjudicate upon, the rights of parties without giving them notice of the proceeding and an opportunity to' defend; nor can it deprive the litigant of his rights, by retrospective legislation which makes void that which was theretofore valid, or vice versa.- There are some things Leg-Matures cannot do. What they do must be within legislative competency. They cannot recall the past....
“The Legislature can say what the law thereafter shall be, but not what it was theretofore; - what it shall be to-morrow, but not what it was yesterday; that is not its province or its function. If an act is done to-day, according to law, the Legislature cannot say to-morrow that the act was unlawful. If a-contract is made to-day according to law, and- is therefore valid, the Legislature will have no power to-morrow to say that it was not made according to law, and is therefore void, and annul it. It can say that a contract made hereafter,- as a former one was made, shall be void, but it cannot make void a contract heretofore made and executed, if valid when made, nor make valid a contract executed in the past, if it was void when made. This is not within legislative competency, and therefore needs no express constitutional inhibition. The Legislature can no more recall the past than it can make black white, or white black, or change the laws of physics or other natural laws. A state Legislature can, of course, do anything within legislative competency which is not inhibited by the state and federal Constitutions; but it needs no inhibition to prevent its doing what, in the very nature of things, according to natural or Divine law, it cannot do. The Constitution itself could not empower the Legislature to recall the past, or to change - a law of physics. Why expressly inhibit the doing of a thing which cannot be done by any human power or agency, much less authorized?”
200 Ala. at 324-25, 76 So. at 90. As I stated earlier, the 2014 amendments do *205 not give new legal effect to abandonment by a parent because that conduct is, and has been, subject to the termination of the abandoning parent’s rights.
I agree with Justice Mayfield that the legislature possesses the power to amend the law, “but it may not do so in a manner that impinges on the judicial power by retroactively, changing the laws that were incorporated into the judgment when it became final.” Ex parte Jenkins, 723 So.2d 649, 658 (Ala.1998). In Plaut v. Spendthrift Farm, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), the Supreme Court acknowledged that Congress possesses the power to amend existing law even if the amendment affects the outcome of pending cases. 514 U.S. at 218. The Supreme Court explained that in such a situation the separation-of-powers doctrine is violated only when Congress tries to apply new law to cases that have already reached a final judgment. 514 U.S. at 226 (“Congress can always revise the judgments of Article III courts in one sense: When a new law makes clear that it is retroactive, an appellate- court must apply that law in reviewing judgments still on appeal that were rendered before the law was eflacted,’ and must alter the outcome accordingly.”). Legislation that would change the law incorporated into a final judgment rendered by the judiciary violates the separation-of-powers doctrine. The Supreme Court recognized that Congress’s retroactive extension of a limitations period does not violate the Due Process Clause by depriving defendants of a vested right. Plaut, 514 U.S. at 227-29 (stating that Congress may retroactively extend a limitations period without violat ing the Due Process Clause (citing Chase Sec. Corp. v. Donaldson, 325 U.S. 304, 311 n. 8, 316, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945)(noting that the retroactive extension of a statutory limitations period did not deprive defendants of a “vested right”))). Nonetheless, the Supreme Court held that Congress violated the separation-of-powers doctrine'by commanding the Judiciary to reopen final judgments to accommodate the extended limitations period. Plant, 514 U.S. at 219.
Plant involved Congress’s reaction to the Supreme Court’s earlier decision in Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), in which the Court adopted a uniform national limitations period for civil actions under § 10(b) of the Securities Exchange Act of 1934. After Lampf was decided, a number of § 10(b) actions were dismissed as untimely, and Plaut’s case was among them. Plaut did not appeal the dismissal. Some months later, Congress enacted a complicated statute that rejected the Lampf holding for cases filed before Lampf was decided and'effectively required a court to reinstate a § 10(b) action on the motion of the plaintiff if the action would have been considered timely under the applicable law as of the day before. Lampf was decided. The Supreme Court distilled from prior cases the principle that Article III grants the federal courts “the power, not merely to rule on cases, but to decide them, subject to review only by superior courts in the Article III hierarchy.” Plaut, 514 U.S. at 218-19. The Court concluded that “[b]y retroactively commanding the federal courts to reopen final judgments, Congress has violated this fundamental principle.” 514 U.S,.at 219. The Supreme Court was careful to distinguish the situation in which Congress, enacts a law with retroactive effect while a case-is still on appeal, recognizing that, in that instance, the appellate court must apply the new law. The Supreme Court stated:
*206 “It is true, as petitioners contend, that Congress can always revise the judgments of Article III courts in one sense: When a new law makes dear that it is retroactive, an appellate court must apply that law, in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly. See United States v. Schooner Peggy, 1 Cranch 103 (1801); Landgraf v. USI Film Products, 511 U.S. 244, 273-280 (1994). Since that is so, petitioners argue, federal courts must apply the ‘new’ law created by § 27A(b) in finally adjudicated cases as well; for the line that separates lower court judgments that are pending on appeal (or may still be appealed), from lower-court judgments that are final, is determined by statute, see, e.g., 28 U.S.C. § 2107(a)(30-day time limit for appeal to federal court of appeals), and so cannot possibly be a constitutional line. But a distinction between judgments from which all appeals have been forgone or completed, and judgments that remain on appeal (or subject to being appealed), is implicit in what Article III creates: not a batch of unconnected courts, but a judicial department composed of ‘inferior Courts’ and ‘one supreme Court. ’ Within that hierarchy, the decision of an inferior court is not (unless the time for appeal has expired) the final word of the department as a whole. It is the obligation of the last court in the hierarchy that rules on the case to give effect to Congress’s latest enactment, even when that has the effect of overturning the judgment of an inferior court, since each court, at every level, must ‘decide according to existing laws.’ Schooner Peggy, supra, 1 Cranch, at 109. Having achieved finality, however, a judicial decision becomes the last word of the judicial department with regard to a particular case or controversy, and Congress may not declare by retroactive legislation that the law applicable to that very case was something other than what the courts said it was. Finality of a legal judgment is determined by statute, just as entitlement to a government benefit is a statutory creation; but that no more deprives the former of its constitutional significance for separation-of-powers analysis than it deprives the latter of its significance for due process purposes. See, e.g., Cleveland Bd. of Ed. v. Loudermill, 470 U.S. 532 (1985); Meachum v. Fano, 427 U.S. 215 (1976).
“To be sure, § 27A(b) reopens (or directs the reopening of) final judgments in a whole class of cases rather than in a particular suit. We do not see how that makes any difference. The separation-of-powers violation here, if there is any, consists of depriving judicial judgments of the conclusive effect that they had when they were announced, not of acting in a manner — viz., with particular rather than general effect — that is unusual (though, we must note, not impossible) for a legislature. To be sure, a general statute such as this one may reduce the perception that legislative interference with judicial judgments was prompted by individual favoritism; but it is legislative interference with judicial judgments nonetheless. Not favoritism, nor even corruption, but power is the object of the separation-of-powers prohibition. The prohibition is violated when an individual final judgment is legislatively rescinded for even the very best of reasons, such as the legislature’s genuine conviction (supported by all the law professors in the land) that the judgment was wrong; and it is violated 40 times over *207 when 40 final judgments are legislatively dissolved.”
Plaut, 514 U.S. at 226-28 (some emphasis added).
In Ex parte Jenkins, supra, this Court addressed, among other things, whether the separation-of-powers doctrine was violated by the retroactive application of a statute permitting the reopening of a final judgment of paternity based on scientific evidence that the adjudged father was in fact not the biological father. Relying on Plant, supra, we held that the Alabama Legislature cannot retroactively amend Rule 60(b), Ala. R. Civ. P., to change the law of finality that was incorporated into final judgments before the legislature’s amendment allowing a father to reopen a final judgment of paternity without regard to the “reasonable time” requirement of Rule 60(b)(6), Ala. R. Civ. P. The paternity judgment in that case became final in 1986, approximately eight years before § 26-17A-1, Ala.Code 1975, became law. Thus, this Court held that the trial court and the Court of Civil Appeals erred in applying § 26-17A-1 to change the rules of finality incorporated into the father’s 1986 final judgment of paternity in Jenkins.
As I stated earlier, the legislature, in expressing its intent that the 2014 amendments apply retroactively, also stated that the amendments are “curative.” That is, the 2014 amendments remedy any jurisdictional conflict created by the Court of Civil Appeals’ opinion that a fit custodial parent could not bring a termination-of-parental-rights petition against the other parent because the child of a fit custodial parent could not be considered dependent, i,e., in need of care and supervision. In Landgraf, 511 U.S. at 267-68, the Supreme Court stated:
“Retroactivity provisions often serve entirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law Congress considers salutary. However, a requirement that Congress first make its intention clear helps ensure that Congress itself has determined that the benefits of retroactivity outweigh the potential for disruption or unfairness.”
Here, by making its intention abundantly clear, the Alabama Legislature demonstrated its determination that the benefits of retroactivity outweighed any potential for disruption or unfairness. In light of the “modest” constitutional impediments to retroactive civil litigation, Landgraf, 511 U.S. at 272, the nature and extent of the change in the law, and the degree of connection between operation of the new law and relevant past conduct, applying the 2014 amendments retroactively comports with the Landgraf Court’s considerations of fair notice, reasonable reliance, and settled expectations. Accordingly, there is no need to analyze whether the AJJA, before the enactment of the 2014 amendments, allowed a parent to terminate the parental rights of the other parent.